### In re O'GARA & MAGUIRE, Inc.

(District Court, D. New Jersey. July 31, 1919.)

1. CORPORATIONS ⊕376—INSOLVENCY—PURCHASE BY CORPORATIONS OF OWN STOCK.

   A corporation may not purchase its own capital stock, except from its surplus earnings or accumulated profits, and if it does so, the purchase is void as against creditors.

2. BANKRUPTCY ⊕340—CLAIMS—BURDEN OF PROOF.

   The burden of proof is generally on one objecting to a claim filed in a bankruptcy court.

3. CORPORATIONS ⊕376—PURCHASE BY CORPORATION OF ITS OWN STOCK.

   Where a corporation, empowered by its charter to purchase its own capital stock only with its "surplus earnings or accumulated profits," purchased its own stock by giving its notes for the purchase price, and had no surplus earnings or profits when the notes became due, payment of the notes cannot be enforced from the corporation's trustee in bankruptcy, although the corporation's surplus and profits may have been equal to the face of the notes at the time they were executed.

In Bankruptcy. In the matter of O'Gara & Maguire, Incorporated, a bankrupt. On review of an order of the referee allowing a claim. Order reversed.

Bilder & Bilder, of Newark, N. J., for trustee.
James R. Mulligan, of Newark, N. J., for claimant.

DAVIS, District Judge. In the latter part of April, 1915, the bankrupt corporation purchased 124 shares of its capital stock belonging to Jane I. Maguire, widow and administratrix of Frank N. Maguire, for $11,600, and gave its three promissory notes, one for $2,300, dated May 1, 1915, and payable November 1, 1915, one dated May 1, 1915, for $3,000, and payable May 1, 1916, and the third for $4,000, dated May 1, 1916, and payable November 1, 1916, in part payment therefor. On December 29, 1916, the corporation was adjudged a bankrupt, at which time $6,559.56 remained unpaid on said notes, and for which a claim was presented and allowed by the referee. His order allowing the same has been brought here for review.

The trustee alleges that the corporation was insolvent at the time that the notes were executed, and that the claim should not be allowed, because the corporation could not acquire its own stock, unless it was purchased out of "surplus earnings and accumulated profits." The referee in his memorandum said:

"It would be a sad state of affairs if a corporation could enter into a contract, receive benefits from such contract, and then say that the contract was not good because it (the corporation) failed to do something which the other party to the contract is unable to compel it to do. This is the grossest example of one benefiting and taking advantage of his own wrongdoing."

This statement by the trustee assumes that this is a contest between the corporation and Mrs. Maguire, who had sold her stock to the corporation. It must be borne in mind that this is not a contest between the corporation and Mrs. Maguire. It is nominally a contest between the trustee and Mrs. Maguire; but the trustee represents creditors, and in fact this is a contest between creditors and Mrs. Maguire. Should the trustee be successful, it would not benefit the corporation, but creditors. Their success, through the trustee, would simply mean that Mrs. Maguire had to stand aside until their claims had been paid in full. The referee concluded that the trustee had not established the insolvency of the corporation. He based the conclusion, very largely, if not altogether, upon the annual statement submitted by the corporation on December 31, 1914. A résumé of that statement, found on the first page, is as follows:

Resources.

| | |
|---|---:|
| Supplies on hand | $ 10,653.14 |
| Stable equipment | 8,694.80 |
| Machinery, tools, and hardware | 29,047.50 |
| Furniture and fixtures | 1,005.11 |
| Reserve fund | 11,202.98 |
| Accounts receivable | 21,316.42 |
| Cash | 8,175.30 |
| Notes receivable | 2,700.00 |
| Life insurance | 441.30 |
| Stationery | 34.50 |
| Dock plant investment | 5,042.34 |
| Auto truck | 4,000.00 |
| Automobiles | 3,600.00 |
| | $105,913.99 |

Liabilities.

| | |
|---|---:|
| Accounts payable | $ 29,913.11 |
| Pay roll accrued | 1,739.29 |
| Notes payable | 30,362.45 |
| Capital stock | 40,000.00 |
| Undivided profits | 3,897.14 |
| | $105,913.99 |

The above statement, slightly incorrect in addition, shows that the resources, or assets, of the corporation are exactly equal to its liabilities; the said undivided profits, which were insufficient to pay for the stock in question, being considered in said statement as a liability.

In this statement the accounts receivable aggregate $21,316.42. It has been established that some of these accounts were uncollectible, had not been collected at the time of the adjudication, and consequently had not been collected when the notes were given to Mrs. Maguire in April, 1915. The natural tendency of the company would be not to underestimate any of its assets in its annual statement. Part of the reserve fund or certificates included in the resources have not been paid and are still in litigation, so that if these, together with the bad bills, had been deducted the liabilities would have exceeded the resources. In any event, the annual statement speaks as of December 31, 1914. The corporation seemed gradually to go from bad to worse. The directors admitted that their stock became impaired and depreciated. In some cases it was sold for 50 per cent. of its par value, and the company did not pay, even in notes, Mrs. Maguire par value for her stock. So, it seems to me, that if the trustee did not actually establish the insolvency of the corporation at the time of the purchase of Mrs. Maguire's stock, he created grave suspicion.

The certificate of incorporation of the company provides that:

"The corporation may use and apply its surplus earnings or accumulated profits to the purchase or acquisition of property, and to the purchase or acquisition of its own capital stock from time to time to such extent, and in such manner, and upon such terms as its board of directors shall determine, and neither the property nor the capital stock so acquired and purchased shall be regarded as profits, for the purpose of declaration or payment of dividends, unless otherwise determined by a majority of the board of directors."

The charter provisions, correctly construed, are the measure of corporate powers. This corporation could not purchase its capital stock, except out of "surplus earnings or accumulated profits." In the case of Central Transp. Co. v. Pullman's Palace Car Co., 139 U. S. 24, 48, 11 Sup. Ct. 478, 484 (35 L. Ed. 55) the Supreme Court said:

"The charter of a corporation, read in the light of any general laws which are applicable, is the measure of its powers, and the enumeration of those powers implies the exclusion of all others not fairly incidental. All contracts made by a corporation beyond the scope of those powers are unlawful and void, and no action can be maintained upon them in the courts, and this upon three distinct grounds: The obligation of every one contracting with a corporation to take notice of the legal limits of its powers; the interest of the stockholders not to be subjected to risks which they have never undertaken; and, above all, the interest of the public that the corporation shall not transcend the powers conferred upon it by law."

The referee held that the burden of proof was upon the trustee. He said:

"I consider that it is too well settled to require argument that it is incumbent upon the trustee to prove that the stock was not purchased from surplus earnings or accumulated profits. * * * The trustee has not sustained the burden of proof to justify me in coming to the conclusion that the purchase was not made out of surplus earnings or accumulated profits."

In a similar contest in this circuit, in the District of Delaware, Judge Bradford held, in the case of Hamor v. Taylor-Rice Engineering Co. (C. C.) 84 Fed. 392, 398, that the burden of proof was upon the person trying to enforce the payment of the notes. He said:

"In so far as the existence of a surplus or fund of net profits at the time of the taking of the original note might tend to the establishment of a right on his part to compete with the creditors of the defendant, the burden of proof rested upon him to show the existence of such surplus or profits. No such showing has been made, and it cannot be assumed that such was a fact. The note must be treated as an undertaking by the defendant to dispose of part of its capital stock to secure a surrender of Willard's shares. It was a contract to do what was ultra vires of. the defendant, as against its creditors, and was a nullity, and therefore the note given in renewal is void."

[1, 2] On legal principles generally, but in some jurisdictions based upon statutory enactment, a corporation may not purchase its capital stock, except out of surplus earnings or accumulated profits. This fact is recognized in the character of the bankrupt corporation. Where its stock is purchased out of other funds by the corporation, the act is ultra vires, and, as against creditors, illegal and void. Creditors, in case of insolvency, are entitled to look to the capital stock as a trust fund for the payment of debts. Credit is extended on the faith that the capital stock will not be impaired. The burden generally is on the objector to a claim, because a claim duly filed has probative force, while an objection has not, and testimony must be introduced to overcome the probative force of the filed claim. The trustee maintains that, even on this theory, he should prevail, for he has borne the burden and established that the stock was not purchased out of surplus earnings or accumulated profits.

[3] The real question in the case arises over the time when a corporation that purchases its own stock must have surplus earnings or accumulated profits out of which to pay for the stock. In case a corporation, purchasing its own capital stock, does not pay for it in cash, but gives its notes, payable at a future date or dates, must it have the surplus earnings or accumulated profits at the time of the execution of the contract, when the notes are signed and delivered, or at the time of the enforcement of the contract, when the corporation is called upon to pay them? The referee found that the corporation was solvent at the time the notes were executed, and that the stock in question was purchased out of the surplus earnings or accumulated profits. What he meant to say was that, at the time of the note transaction, the corporation was solvent and had surplus earnings and accumulated profits. If these findings are true, and the law does not require that the corporation have surplus earnings or accumulated profits at the time the note matured and payment was demanded, the objections should be overruled and the order affirmed. If, however, in order to make the contract valid against creditors, the law requires that the corporation must have surplus earnings or accumulated profits out of which to pay the notes when they became due, the objections should be sustained, and the order reversed.

This question must not be confused with the right of a corporation to take its stock as security for an antecedent debt. There is no evidence that Mrs. Maguire was indebted to the corporation in any amount covered by any of the notes in question. The corporation took the stock outright to get clear of her, because the directors, or some of them, did not want her in the office. She was

insisting upon being employed as her husband had been, and in order to put themselves in position gracefully to deny her request the corporation conceived the scheme to purchase her stock, so that she would not be in position to demand employment.

This question, so far as I have been able to discover, has not been passed upon in this district or circuit, but it has been passed upon by the United States Circuit Court of Appeals for the Second Circuit in the case of In re Fechheimer-Fischel Co., 212 Fed. 357, 129 C. C. A. 33. On page 362 of 212 Fed. (129 C. C. A. 38), Judge Rogers, speaking for the court, said:

"Assuming that the corporation was solvent when the stock was purchased, and that the contract was therefore valid at that time, the question we have to decide is as to the effect of subsequent insolvency of the corporation upon this obligation of the company to pay for the stock. We are not aware that the New York courts have dealt with that question, and we must decide it upon principle, with the aid of such light as the decided cases throw upon it."

The court held that, since the corporation had become insolvent between the time the note was given for its own stock and the date of its maturity, payment could not be enforced, because it would impair the capital stock, which was a trust fund for the payment of creditors. On page 363, of 212 Fed., on page 39 of 129 C. C. A., Judge Rogers said:

"If, at the time the stockholder receives payment for his stock, the payment prejudices the creditors, payment cannot be enforced. If a stockholder sells his stock to a corporation which issued it, he sells at his peril and assumes the risk of the consummation of the transaction without encroachment upon the funds which belong to the corporation in trust for the payment of its creditors. The right of the creditors of the corporation cannot be defeated by the fact that at the time the transaction was entered into the seller of the stock and the officers of the company who purchased it were acting in good faith and supposed that the company was solvent."

It was assumed in that case that the corporation was solvent at the time the transaction was entered into, and the decision was based upon that assumption.

The decision in that case is sound in principle. The capital stock of a corporation is a trust fund for the payment of creditors. It takes the place of individual liability in firm and individual transactions. Faith that the capital stock will not be impaired is the basis of the extension of corporate credit and an inspiration to commercial transactions. Creditors have the right to look to this fund as sacred and inviolable, and to assume that it will be preserved for their protection. Unless it be held that a contract by a corporation for the purchase of its capital stock cannot be enforced, except out of surplus earnings or accumulated profits, the security of creditors is gone, and a door for fraud is opened. A stockholder, who sells his stock to the company that issued it, without receiving cash therefor out of surplus earnings and accumulated profits, must take the responsibility and assume the risk that payment at some future day will not impair the capital stock. This responsibility is not affected by the solvency of the corporation at the time the contract was made or the good faith of its officers in the execution thereof.

In the case at bar, the "resources" and "liabilities," which included the said undivided profits, of the corporation on December 31, 1914, according to the annual statement, were equal. As a matter of fact the testimony shows that some of the resources enumerated and included in the total to make the resources equal the liabilities were without value and should not have been included. The liabilities were therefore at that time possibly greater than the resources. There were therefore, not sufficient surplus earnings or accumulated profits out of which the corporation could pay for its capital stock, and the financial condition of the corporation is not shown to have been better in April, 1915, but worse, for it then had no ready cash. When the corporation was adjudicated a bankrupt, it had no surplus earnings or accumulated profits with which the notes could be paid. The claimant was a stockholder, and entered into the contract for the sale of her stock to the corporation which issued it.

Even if the conclusions of the referee as to the solvency of the corporation and its possession of surplus earnings or accumulated profits at the time of the execution of this contract be correct (and under the evidence, about which there is no dispute, I do not see how they can be), such financial reverses were suffered that the consummation of the contract necessitates financial loss, on the one hand, to the stockholder who was on the inside and knew the facts, or, on the other hand, to innocent creditors, who were on the outside, without knowledge of the facts. It would be inequitable that uninformed, innocent persons should sustain the loss rather than the person who was a party to the execution of the contract, over the consummation of which this dispute has arisen. The capital stock may not be impaired to the injury of creditors by allowing the claim based upon said notes. The claimant must stand aside until the claims of creditors are satisfied in full, if there are sufficient funds to satisfy their claims.

It follows that the objections must be sustained, and the order allowing the claim of Mrs. Maguire reversed.