TEXAS & PACIFIC RAILWAY CO. *v.* POTTORFF, RECEIVER.

No. 128.   Argued December 7, 1933.—Decided February 5, 1934.

*Mr. M. E. Clinton,* with whom *Messrs. Del W. Harring-ton* and *T. D. Gresham* were on the brief, for petitioner.

*Messrs. Henry E. Hackney* and *Thornton Hardie*, with whom *Messrs. Ben R. Howell, F. G. Awalt,* and *George P. Barse* were on the brief, for respondent.

By leave of Court, *Messrs. Charles N. Burch* and *Edward W. Smith* filed a brief on behalf of the Illinois Central Railroad Co., as *amicus curiae*.

MR. JUSTICE BRANDEIS delivered the opinion of the Court.

The main question for decision is whether a national bank has power to pledge a part of its assets to secure a private deposit.

The First National Bank of El Paso, Texas, failed on September 4, 1931, and S. O. Pottorff was appointed receiver. The Texas & Pacific Railway Company was then, and long had been, a depositor. To secure it as such the bank had, in January, 1931, pledged $50,000 Liberty Bonds and held them for the Railway in the Trust Department of the bank. The balance in the Railway's regular checking account at the time of the failure was $54,646.94. Of this claim it made proof as a secured creditor. The receiver approved the amount of the claim, but denied the validity of the pledge; and he tendered a dividend check only for the amount to which the Railway would have been entitled as an unsecured creditor. Thereupon, the Railway brought, in the federal court for western Texas, this suit against the receiver, praying, in the alternative, that the bonds be delivered to it; or that they be sold for its benefit; or that the claim be paid in full with interest. The receiver filed a cross-bill praying that the bank's title to the bonds be quieted.

The case was first heard upon motions to dismiss the bill and the cross-bill. The decision on the motions was postponed until after hearing the case upon the evidence. Thereupon the court dismissed the bill and en-

tered a decree for the receiver upon the cross-bill, holding that the pledge was void and that the Liberty Bonds constituted assets to be administered for the benefit of the general creditors of the bank. The Circuit Court of Appeals affirmed the decree. 63 F. (2d) 1. This Court granted certiorari. The Railway contends that the bank had power to make the pledge; that even if the bank did not have such power, the receiver is not in a position to question the validity of the pledge; and that even if he is not estopped from doing so, he may not disaffirm it without returning the consideration therefor received by the bank. We are of opinion that none of these contentions is sound.

The District Court found the following additional facts. The relation between the Railway and the bank began in 1922 when the Railway was in receivership. Then, an order was entered appointing the bank a depositary upon condition that it should furnish a bond with solvent sureties. An acceptable bond was then given in the sum of $25,000. When, in 1924, the receivership terminated, the Railway continued its deposit account; and a bond in like amount was given with the National Surety Company as surety. When, in 1927, the average deposits had increased to about $50,000, an additional bond of $25,000 was given with the Maryland Casualty Company as surety. While these bonds were in full force and effect and the bank was solvent, it requested the Railway to accept, in substitution for the surety bonds, the pledge of the $50,000 Liberty Bonds, giving as its reason for the request that the premiums payable on the surety bonds were a burden from which it wished to be relieved. The Railway expressed willingness to assent to the substitution, but only on condition that thereby it would be as fully protected as by the surety bonds. The bank and its attorney gave this assurance; and thereupon the pledge was substituted

for the surety bonds and these were cancelled. Without that assurance, the Railway would not have consented to the cancellation of the surety bonds; or if they had been cancelled without its consent, would have immediately withdrawn all of its deposits. In reliance upon the assurances and the pledge, the Railway continued until the failure to make deposits; and in fact increased its deposits.

National bank examiners commenced on August 6, 1931, an examination of the bank. Within a few days, they learned from the bank's books that the pledge had been made; but neither the examiners nor the Comptroller of the Currency advised the bank's officers that the pledge was beyond the powers of the bank or that it was irregular or otherwise objectionable. The bank had frequently secured private deposits by surety bonds; but never before by a pledge of assets. The examiners concluded their investigation on August 20, 1931. The failure occurred on September 4, 1931.

*First.* National banks lack power to pledge their assets to secure a private deposit. The measure of their powers is the statutory grant; and powers not conferred by Congress are denied.[1] For the Act [2] under which national banks are organized constitutes a complete system for their government, *Cook County National Bank* v. *United States,* 107 U.S. 445, 448; *California Bank* v. *Kennedy,*

---

[1] *First National Bank* v. *National Exchange Bank,* 92 U.S. 122, 128; *Logan County National Bank* v. *Townsend,* 139 U.S. 67, 73; *California Bank* v. *Kennedy,* 167 U.S. 362; *Concord First National Bank* v. *Hawkins,* 174 U.S. 364; *First National Bank* v. *Converse,* 200 U.S. 425, 439. Compare *McCormick* v. *Market Bank,* 165 U.S. 538, 549; *Merchants National Bank* v. *Wehrmann,* 202 U.S. 295.

*United States* v. *Robertson,* 5 Pet. 641, and *Planters' Bank* v. *Sharp,* 6 How. 300, have no application to the National Banking Act.

[2] Act of June 3, 1864, c. 106, § 8, 13 Stat. 101; R.S. 5136; 12 U.S.C. § 24, Seventh.

167 U.S. 362, 366; *First National Bank* v. *Missouri,* 263 U.S. 640. Confessedly the power to pledge assets to secure a private deposit was not granted in specific terms. The contention is that this power is incidental to the general grant of powers "necessary to carry on the business of banking . . . by receiving deposits"; and, hence, is implied.[3]

There is no basis for the claim that the power to pledge assets is necessary to deposit banking. The record is barren of evidence that the practice of so pledging assets has ever prevailed among national banks. And facts of which we take judicial notice indicate that among national banks such action must have been deemed contrary to good banking practice.[4] From the establishment of the system in 1864 to March 1, 1933, 2159 national banks failed[5] and there has been much litigation arising from their insolvency; but only two other reported cases have been found involving a pledge of assets to secure a private deposit, and in those cases, very recent ones, the existence of the power was denied.[6] *Smith* v. *Baltimore & O. R.*

---

[3] Compare *Jacob Ruppert* v. *Caffey,* 251 U.S. 264, 301.

[4] No mention of securing a private deposit in a national bank by a pledge of assets or otherwise has been found in any published report of the Comptroller (compare note 6); or in any of the 52 available treatises or textbooks on banks and banking practice published since 1900; in any of the annual proceedings of the American Bankers Association or in any issue of the American Banker's Journal; or in any issue of The Commercial and Financial Chronicle since 1900; or in the New York Times Index since 1913. Compare "Contemporary Banking," by Willis, Chapman & Robey (1933), p. 336.

[5] Annual Report of Comptroller of the Currency (1932) 148. Federal Reserve Bulletin (1933) 144. (Figures from these two sources have been combined.)

[6] In that case the parties stipulated, and the District Court found (p. 864) that "during, before, and after the said period of February 23, 1928, to July 31, 1930, when the said Comptroller was requested by national banks or others for an opinion upon the power of national banks to pledge securities to secure a private depositor, in every in-

*Co.*, 48 F. (2d) 861; 56 F. (2d) 799; *Illinois Central R. Co.* v. *Rawlings*, 66 F. (2d) 146. In the case at bar, there is a specific finding that the transaction challenged was the only instance in which this bank had ever pledged assets to secure a private deposit. Surely action cannot be deemed a necessary incident of a business when only a single instance has been found in which it was taken. Moreover, even a practice commonly pursued may not be a necessary one.[7]

To permit the pledge would be inconsistent with many provisions of the National Bank Act which are designed to ensure, in case of disaster, uniformity in the treatment of depositors and a ratable distribution of assets. Compare *Davis* v. *Elmira Savings Bank*, 161 U.S. 275, 290. This policy of equal treatment was held to preclude, in case of a national bank, even the preference under § 3466 of the Revised Statutes which otherwise is accorded to the United States when its debtor becomes insolvent. *Cook County National Bank* v. *United States*, 107 U.S. 445. The effect of a pledge is to withdraw for the benefit of one depositor part of the fund to which all look for protection. Thereby the legitimate expectations of a great body of the depositors are defeated and confidence in the fairness of the national banking laws and administration is impaired. It is no answer to say that the other depositors are benefited by the increased resources which the pledge brings to the bank, or at least are not harmed, since the new funds take the place of the securities pledged and are available to meet

---

stance the Comptroller disapproved of such pledges by stating that in his opinion national banks had no such power."

[7] Compare *Federal Reserve Bank* v. *Malloy*, 264 U.S. 160, 167. A practice is not within the incidental powers of a corporation merely because it is convenient in the performance of an express power. *Merrill* v. *Monticello*, 138 U.S. 673, 692; compare *Beaty* v. *Knowler's Lessee*, 4 Pet. 152, 168–171.

liabilities.[8] The immediate safety of unsecured creditors depends on the bank remaining open and solvent; the pledge reduces the fund of quick assets available to meet unusual demands without any assurance that the deposit will be used to replenish this fund.

The fact that this bank had frequently secured private deposits by surety bonds lends no support to the contention that the power to pledge assets is necessary to carrying on the business of deposit banking. Such a practice would likewise be a departure from the policy of equal treatment of depositors; but the loss to other depositors resulting from such action would be far less serious. A pledge withdraws capital assets, while the giving of a surety bond merely increases the bank's expenses. There is, however, no finding that among national banks

---

[8] These arguments seem to ignore the realities of the banking business. The primary interest of a depositor is that the bank shall be able to pay as and when he demands payment. The ability to do so depends not on the bulk of the assets but on their liquidity. The law applicable to national banks requires them to maintain as reserves in the form of cash or of cash balances with a federal reserve bank, fixed percentages of their demand deposits in order to assure ability to meet probable demands as they arise; but such reserve is commonly deemed insufficient to meet possible emergencies. Because of this, soundly managed banks maintain so-called " secondary reserves," usually in the form of government obligations which can be liquidated quickly with little or no loss. The effect of pledging quick assets for particular deposits is to reduce the fund available for meeting current demands of an unexpected nature. The funds received from the deposit are not necessarily an equivalent for the securities withdrawn from available resources. In the first place the deposit, in the process of clearing and collection, may serve merely to cancel liabilities against the bank. This may mean that there will be fewer competing claims in case of insolvency, but it will still be true that the reserves have been depleted considerably beyond what would be justified by reason of the cancellation of the liability. In the second place, to the extent that the deposit represents free funds, it is not probable that the deposit will be used to buy other low yield quick assets to take the place of those which have been pledged.

there exists the practice of securing by surety bonds some private deposits. If there has been such a practice, it must have been a secret one; for reference to it has not been found in either official reports, or the books on banking or other publications dealing with financial affairs.[9] Whether a national bank could legally engage in such a practice we have no occasion to decide.[10]

The Railway insists that Congress in providing that the Secretary of the Treasury might deposit public money in national banks upon receiving satisfactory security by " the deposit of United States bonds or otherwise," Act of June 3, 1864, c. 106, § 45, 13 Stat. 113,[11] assumed a gen-

[9] See note 4. However, compare Lunt, Surety Bonds (1930), 206.

[10] *Nebraska* v. *First National Bank of Orleans*, 88 Fed. 947, and *Interstate National Bank* v. *Ferguson*, 48 Kan. 732; 30 Pac. 237, held in the case of a deposit of public funds that the practice was legal. Two Attorneys General have expressed the opinion that national banks lacked the power to pay for guaranteeing all depositors. 27 Op. Atty. Gen. 37, 40; 272, 279. But see 30 Op. Atty. Gen. 341, *contra.*

[11] The original national bank act of 1863 had provided merely that the Secretary of the Treasury might deposit public moneys in national banks. By legislation subsequent to 1864 national banks have been made depositaries of moneys of bankrupt estates, Act of July 1, 1898, c. 541, § 61, 30 Stat. 562; of Indian moneys, March 3, 1911, c. 210, § 17, 36 Stat. 1070; May 25, 1918, c. 86, § 28, 40 Stat. 591; of funds in the hands of the receivers of insolvent national banks, May 15, 1916, c. 121, 39 Stat. 121; of postal funds, May 18, 1916, c. 126, § 2, 39 Stat. 159; of proceeds from the sale of bonds, Sept. 24, 1917, c. 56, § 8, 40 Stat. 291; April 4, 1918, c. 44, § 5, 40 Stat. 504; July 9, 1918, c. 142, § 4, 40 Stat. 845; and of a number of other public funds. In all of these statutes the depositor is required to take security; but therein likewise nothing is said as to the power of the bank to pledge the required securities. Two of these statutes, those relating to deposits of the funds of insolvent banks and of bankrupt estates, have reference to the deposit of private funds. In some of the legislation, not only national, but state, banks also are made depositaries. It is true that Congress cannot make valid a pledge by a state bank, but that does not make it any the less likely that Congress intended to make valid every pledge by a national bank that would be called for

258

eral power in national banks to pledge their assets to secure deposits; and that the assumption indicates that it intended this power to be among the " incidental " powers granted by § 8. But without such assumption, the duty of the Secretary to demand a pledge authorizes a national bank to make it.[12] We may not import into § 8 a meaning not derivable from the words of that section and inconsistent with other provisions of the Act. Moreover, if the Railway's argument were sound it would have been unnecessary to amend § 45 as was done by the Act of June 25, 1930, c. 604, 46 Stat. 809, which provides:

"Any association may, upon the deposit with it of public money of a State or any political subdivision thereof, give security for the safe-keeping and prompt payment of the money so deposited, of the same kind as is authorized by the law of the State in which such association is located in the case of other banking institutions in the State."

This amendment indicates that Congress believed that the original Act had not granted general power to pledge assets to secure deposits.[13] The fact that the amendment was made to § 45 indicates that the power to pledge was granted only as an incident of the public officer's duty to demand a pledge. If, as is sug-

under the statute. It would be the duty of a public officer depositing in a state bank to make sure that it had the power to give the security required by Congress.

[12] Where a statute specifically forbids a preferential pledge, it has been held that a public officer's duty to demand a pledge impliedly gives power to pledge in that specific case. *Maryland Casualty Co. v. Board of Comm'rs*, 128 Okla. 58; 260 Pac. 1112; 31 Op. Atty. Gen. (U.S.) 41.

[13] Senator Thomas, in introducing the bill, stated in the Senate: " It is a bill simply to confer on a national bank the same opportunity for the giving of security for the safe-keeping and prompt payment of state and county moneys, as is authorized with reference to state banking institutions." 72 Cong.R. 6243.

gested, the 1930 amendment was passed merely in order to settle doubts as to the power of a national bank to pledge its assets to secure deposits, the amendment would naturally have been made not to § 45, but to § 8 which contains the grant of " incidental " powers.

The Railway urges also that since the relation of the bank to its depositors is that of debtor to creditor, and since a national bank may borrow money, *Aldrich* v. *Chemical National Bank,* 176 U.S. 618; *Auten* v. *U.S. National Bank,* 174 U.S. 125, and pledge its assets therefor, *Wyman* v. *Wallace,* 201 U.S. 230, it may likewise pledge assets to secure a private deposit. The fallacy of this contention has been many times exposed.[14] The difference between deposits and loans is fundamental and far-reaching. The amount of the deposits is commonly accepted as a measure of the bank's success; an increase of deposits as evidence of increased prosperity. The depositor does not think of himself as lending money to the bank. The modern deposit grew out of the older form of deposit in which the fund was held separate and intact, and the sole purpose of the deposit was safe-keeping. Safe-keeping is still a very important function of deposit banking; and from the point of view of most depositors the chief one.[15] Borrowing by a bank (as distinguished from a re-discount) is commonly regarded as evidence of weak-

[14] *Farmers & Merchants Bank* v. *Consolidated School District,* 174 Minn. 286, 291; 219 N.W. 163; *State Bank of Commerce* v. *Stone,* 261 N.Y. 175; 184 N.E. 750; *Divide County* v. *Baird,* 55 N.D. 45, 52; 212 N.W. 236; *Commercial Banking & Trust Co.* v. *Citizens Trust & Guaranty Co.,* 153 Ky. 566, 574; 156 S.W. 160; 27 Col. L. Rev. 88; 79 U. of Penn. L. Rev. 608, 614.

[15] Though large deposits frequently represent loans by the bank to the depositor, this is less likely to be true of small accounts. Out of 30,556,105 accounts reported by 5,500 licensed member banks of the Federal Reserve System, 29,482,384 were under $2,500 and the average size of these accounts was $189. Federal Reserve Bulletin, July 1933, p. 454. [See order, *post,* p. 649.]

ness.[16]   Often the loan is made in the hope of averting insolvency.   Loans made by one bank to another commonly involve a pledge of assets, since only upon such a condition is the transaction possible.   *Wyman* v. *Wallace, supra.*

*Second.* The receiver is not estopped to deny the validity of the pledge.   The Railway's argument is that the bank could not set up the defence of *ultra vires* since it had the benefit of the transaction; and that the receiver, as its representative, can have no greater right.. Neither branch of the argument is well founded.   The bank itself could have set aside this transaction.   It is the settled doctrine of this Court that no rights arise on an *ultra vires* contract, even though the contract has been performed; and that this conclusion cannot be circumvented by erecting an estoppel which would prevent challenging the legality of a power exercised.   *California Bank* v. *Kennedy,* 167 U.S. 362; *McCormick* v. *Market Bank,* 165 U.S. 538; *Central Transportation Co.* v. *Pullman Co.,* 139 U.S. 24.[17]   But even if the bank would have been estopped from asserting lack of power, its receiver would be free to challenge the validity of the pledge.   The unau-

---

[16] The Comptroller of the Currency has insisted on the distinction between deposits and borrowings and has stated that to list borrowings as deposits—e.g., as certificates of deposit—is a grave misrepresentation of the condition of the bank.   Annual Report 1890, p. 13; 1892, p. 39.

" The fact that more than one-half of the national banks reporting were not borrowing from any source is additional evidence of the stability of the national banking system." Annual Report of Comptroller of the Currency (1922), p. 26.

[17] See also *Pearce* v. *Madison & I. R. Co.,* 21 How. 441; *Thomas* v. *Railroad Co.,* 101 U.S. 71; *Pennsylvania R. Co.* v. *St. Louis, A. & T. H. R. Co.,* 118 U.S. 290; *Oregon Ry. & N. Co.* v. *Oregonian Ry.*

thorized pledge reduced the assets available to the general creditors. It is the duty of the receiver of an insolvent corporation to take steps to set aside transactions which fraudulently or illegally reduce the assets available for the general creditors, even though the corporation itself was not in a position to do so.[18]

*Third.* The receiver may assert the invalidity of the pledge without making restitution by paying the pledgee's claim in full. The Railway's argument to the contrary is that when as a result of an *ultra vires* contract one of the parties is enriched at the expense of the other, the law creates an obligation to repay *ex aequo et bono* to the extent of the enrichment. The argument if applicable would not help the Railway. Such claim under the doctrine of unjust enrichment is assimilated to an obligation of contract; and does not, in the absence of an identifiable *res* [19] and a constructive trust based on special circum-

---

*Co.*, 130 U.S. 1; *Concord First Nat. Bank* v. *Hawkins*, 174 U.S. 364; *De La Vergne Co.* v. *German Savings Inst.*, 175 U.S. 40.

. And on the matter of estoppel in pledge cases, see authorities cited in note 14. Also *Smith* v. *Baltimore & Ohio R. Co.*, 48 F. (2d) 861, 869; affirmed 56 F. (2d) 799; *contra: State Bank of Commerce* v. *Stone*, 261 N.Y. 175; 184 N.E. 750. Also compare *West Penn Chemical & Mfg. Co.* v. *Prentice*, 236 Fed. 891.

[18] *King* v. *Pomeroy*, 121 Fed. 287; *Hamor* v. *Taylor-Rice Engineering Co.*, 84 Fed. 392, 399; *In re O'Gara & Maguire, Inc.*, 259 Fed. 935, 936; *In re K-T Sandwich Shoppe*, 34 F. (2d) 962, 963; *Shooter's Island Shipyard Co.* v. *Standard Shipbuilding Corp.*, 293 Fed. 706.

[19] The claimant has the burden of identifying the property in its original or altered form. *Schuyler* v. *Littlefield*, 232 U.S. 707. It is not enough to show that at the time of receipt the general assets of the insolvent were increased or that debts were discharged. *Wuerpel* v. *Commercial Germania Bank*, 238 Fed. 269, 272–3; *Knauth* v. *Knight*, 255 Fed. 677; *State Bank of Winfield* v. *Alva Security Bank*, 232 Fed. 847; *In re See*, 209 Fed. 172; *In re Dorr*, 196 Fed. 292; *City*

stances of misconduct, confer a preference over other creditors. The pledge here challenged having failed because illegal, the Railway is entitled only to a dividend as a general creditor.[20] Its right thereto is conceded.

*Affirmed.*

*Bank* v. *Blackmore,* 75 Fed. 771; compare *St. Louis & S. F. R. Co.* v. *Spiller,* 274 U.S. 304, 311; *Cunningham* v. *Brown,* 265 U.S. 1.

[20] Compare *Blakey* v. *Brinson,* 286 U.S. 254; *Handelsman* v. *Chicago Fuel Co.,* 6 F. (2d) 163.