CALCASIEU NAT. BANK IN LAKE CHARLES et al. v. BANK OF ABBEVILLE & TRUST CO.

No. 8024.

Circuit Court of Appeals, Fifth Circuit.

May 2, 1936.

Rehearing Denied June 5, 1936.

Alvin O. King, of Lake Charles, La., for appellants.

J. Blanc Monroe, Monte M. Lemann, and Walter J. Suthon, Jr., all of New Orleans, La., for appellee.

Before SIBLEY, HUTCHESON, and HOLMES, Circuit Judges.

HOLMES, Circuit Judge.

The appellee, Bank of Abbeville & Trust Company, was awarded a secured judgment in the court below against appellant Calcasieu National Bank, for the aggregate amount of five checks, with interest, drawn on appellant by the Unemployment Relief Committee of Louisiana to the order of Vermillion Unemployment Relief Committee. The first three checks, in the respective sums of $477, $695, and $14.44, for a valuable consideration, were acquired by appellee, a Louisiana state bank, by indorsement of the payee, and on March 1, 1933, were forwarded by said bank to the said Calcasieu National Bank with instructions to remit the proceeds to the Hibernia Bank & Trust Company, New Orleans, for credit and advice of appellee. On March 3, 1933, appellee forwarded to appellant for collection, with similar in-

structions, two other checks, similarly drawn and indorsed, for $523.50 and $34.38, respectively. On March 3, 1933, appellant marked the first three checks paid, debited them to the account of the drawer, and on the same day forwarded to the Hibernia Bank & Trust Company, New Orleans, its draft on the Whitney National Bank of New Orleans for $1,159.46, the sum of said checks plus another item of $4. On March 4, 1933, it marked the other two checks paid, debited them to the account of the drawer, and on that date forwarded to the said Hibernia Bank its draft on the New Orleans branch of the Federal Reserve Bank for $557.98, the total thereof.

Having operated unrestrictedly as a going concern through March 1, 1933, the appellant did no business on March 2d, in consequence of a general banking holiday proclaimed by the Governor of Louisiana. On March 3d and 4th, it opened by permission of the state authorities on a restricted withdrawal basis of 5 per cent., but this limitation by such permission was not applied to the account of the Unemployment Relief Committee which functioned unrestrictedly and which was replenished on March 3d by a cash deposit of $40,000. This was the situation which existed at the time the above-mentioned five checks were received, marked paid, debited to the account of the drawer, and the proceeds forwarded to the Hibernia Bank for credit and advice of appellee. Up to this point there had been no intervention of any federal official agency.

March 5, 1933, came on Sunday. In consequence of the banking holiday proclaimed by the President on the following day, the Calcasieu National Bank in Lake Charles was closed on March 6, 1933, and remained closed until March 16, 1933, when a conservator was appointed and placed in charge of it. The remittance checks drawn by it upon the Whitney Bank of New Orleans and the Federal Reserve Bank of Atlanta were never paid. The conservator permitted the Unemployment Relief Committee to withdraw the full amount of the balance remaining in its checking account, and appellee contends that the amount thus paid out by the conservator in those withdrawals was $1,713.44 less than it would have been but for the debiting against this account of the five checks forwarded for collection by the appellee to the Calcasieu National Bank.

Priority of payment over general creditors of the insolvent bank is claimed by the Bank of Abbeville on two grounds: First, under general principles of federal law, an equitable lien is asserted; and, second, under a statute of the state of Louisiana (Act No. 63 of 1926), a privilege to secure the payment of said checks is claimed on all of the bank's assets in the hands of the conservator. The District Court upheld both contentions.

We do not find in the facts presented by this record the elements requisite to raise an equitable lien in behalf of appellee, the forwarding bank and owner of the checks. There was no trust relation between the parties, no augmentation of the assets of the insolvent bank, and no tracing of the funds into the hands of the conservator. The relation between the parties as a result of the transaction was that of debtor and creditor, not that of trustee and cestui qui trust. The Bank of Abbeville placed no funds in the hands of the Calcasieu Bank to be held in trust, but accepted the latter bank as its debtor when it failed to demand cash and merely requested it to remit the proceeds to the Hibernia Bank; the implication being that it should remit in the ordinary way through regular banking channels. In the second place, there was no augmentation of the assets of the Calcasieu Bank, but only a shifting of credits; the assets being exactly the same before as after each transaction. The bank had no more and no less money or property by reason thereof, but only a new creditor. The third requisite heretofore mentioned as being absent in this case is the failure of the plaintiff below to trace a trust fund into the hands of the conservator or trustee of the bank. Because there was a balance of $6,208.99 on the books of the Whitney National Bank to the credit of the Calcasieu National Bank at the time the banking holiday was declared, which was turned over to the conservator, the contention is made that there was a tracing, at least so far as the draft for $1,159.44 on the Whitney Bank is concerned; but this was merely an undiminished asset which the bank owned before, and without reference to, the shifting of credits involved in these transactions. Since there was no trust relation and no augmentation, it requires no extended argument to demonstrate that no trust fund was traced into the hands of the conservator, as it is

impossible to trace something that never existed. Anheuser-Busch Brewing Ass'n v. Clayton (C.C.A.) 56 F. 759; Ellerbe v. Studebaker Corp. (C.C.A.) 21 F.(2d) 993; Fiman v. State of South Dakota (C.C.A.) 29 F.(2d) 776, certiorari denied 279 U.S. 841, 49 S.Ct. 254, 73 L.Ed. 987; Allied Mills v. Horton (C.C.A.) 65 F.(2d) 708, 90 A.L.R. 1; Lifsey v. Goodyear Tire & Rubber Co. (C.C.A.) 67 F.(2d) 82; First National Bank of St. Petersburg v. Miami (C.C.A.) 69 F.(2d) 346; Spradlin v. Royal Manufacturing Co. (C.C.A.) 73 F.(2d) 776; Brownell v. Turman (C.C.A.) 75 F.(2d) 913; Hanna v. Consolidated School District (C.C.A.) 78 F.(2d) 374; Blakey v. Brinson, 286 U.S. 254, 52 S.Ct. 516, 76 L.Ed. 1089, 82 A.L.R. 1288; Jennings v. U. S. F. & G. Co., 294 U.S. 216, 55 S. Ct. 394, 79 L.Ed. 869, 99 A.L.R. 1248; Old Company's Lehigh v. Meeker, 294 U. S. 227, 55 S.Ct. 392, 79 L.Ed. 876.

■ We turn now to a more intricate question, that of whether the appellee is to be accorded priority of payment under a Louisiana statute entitled: "An Act To regulate banks and banking, and to create privileges against the assets of banks in certain cases" (Act 63 of 1926). Sections 2 and 3 of the act are as follows:

"Section 2. That whenever any bank shall send for collection to any other bank, domiciled in a different place, a check or draft drawn on the latter bank by a depositor of such drawee bank and such drawee bank shall have charged or debited the account of said depositor with said check or draft and shall have drawn a check or draft on any bank in representation of the amount thereof, then the bank hereinabove first mentioned in this section shall have a privilege on all the property and assets of the bank hereinabove secondly mentioned in this section to secure the payment of the amount of said check or draft hereinabove first mentioned, which privilege shall be superior to the claims of all depositors of said secondly mentioned bank, the claims of all creditors of said secondly mentioned bank having no privilege, and to all other general privileges on the property and assets of said secondly mentioned bank, except the privilege created by Section 1 of this act and those for law and judicial charges.

"Sec. 3. That the word 'bank,' shall, for the purposes of this act be considered to include bank, 'National Bank,' 'banker,' 'banking association,' 'saving bank,' and 'trust company.'"

The facts of this case clearly come within the provisions of section 2, and the intention of the State Legislature to make it applicable to national banks is expressly stated in section 3. A "privilege," as used in section 2, is a term which signifies a statutory lien. Under the Louisiana Civil Code it is defined as "a right, which the nature of a debt gives to a creditor, and which entitles him to be preferred before other creditors, even those who have mortgages." Article 3186. In the case of an insolvent state bank, this court has held that "the privilege given by Act No. 63 is not conditioned on insolvency, nor is it a preference arising on liquidation of a bank, but it arises against the assets of any bank so soon as the things are done which the statute names." Interstate Trust & Banking Co. v. Jones County, Miss. (C.C.A.) 77 F.(2d) 806, 808. It has also held that liens arising by state laws prior to the failure of a national bank are not invalidated by receivership proceedings. Webster v. Sweat (C.C.A.) 65 F.(2d) 109, citing Scott v. Armstrong, 146 U.S. 499, 510, 13 S.Ct. 148, 36 L.Ed. 1059. On the other hand, in the case of Davis v. Elmira Savings Bank, 161 U.S. 275, 16 S.Ct. 502, 506, 40 L.Ed. 700, the court held void when attempted to be applied to a national bank a law of the state of New York directing priority of payment by the receiver of an insolvent bank of deposits by savings banks, on the ground that the law conflicted with section 5236 of the Revised Statutes of the United States (12 U.S. C.A. § 194) directing the Comptroller of the Currency to make ratable dividends of the money paid over to him by such receiver. The court distinguished Scott v. Armstrong, supra, and, after pointing out that national banks are instrumentalities of the federal government, created for a public purpose, and necessarily subject to the paramount authority of the United States, stated: "Nothing, of course, in this opinion is intended to deny the operation of general and undiscriminating state laws on the contracts of national banks so long as such laws do not conflict with the letter or the general objects and purposes of congressional legislation. Much was said in argument as to the public policy embodied in the law of the state of New York, and the wisdom of upholding it. Our function is

judicial, and not legislative. Did we, however, consider motives of public policy, we should not be unmindful of the wise safeguard in favor of all the people of the United States resulting from the provision which secures to every one dealing with a national bank a ratable distribution of the assets thereof, thereby stimulating confidence and uniformity of treatment."

Prior to the Act of June 25, 1930 (12 U.S.C.A. § 90), a national bank had no power to make any pledge to secure deposits except the federal deposits specifically provided for by act of Congress. Texas & Pacific Ry. Co. v. Pottorff, 291 U.S. 245, 54 S.Ct. 416, 78 L.Ed. 777; City of Marion v. Sneeden, 291 U.S. 262, 54 S.Ct. 421, 78 L.Ed. 787. Therefore, when a national bank was appointed a depository of state funds, under statutes of Georgia, upon giving a bond with sureties which undertook to create a lien on all the bank's assets for the security of the bond, no lien arose except such as was authorized by the above cited Act of June 25, 1930 (12 U.S.C.A. § 90), which empowers any national bank, upon the deposit with it of public money of a state or any political subdivision thereof, to give security for the safekeeping of money so deposited of the same kind as is authorized by the laws of the state in which said national bank is located; but the authority under said act, the court held, was not limited to the pledging of specific assets to secure public deposits, but was broad enough to authorize a general lien on present and future assets wherever banks organized under the •laws of the state have that power. Lewis, Receiver, v. Fidelity & Deposit Co., 292 U.S. 559, 54 S.Ct. 848, 78 L. Ed. 1425, 92 A.L.R. 794.

Bearing in mind that the privilege claimed should be allowed unless its existence is incompatible with the national banking scheme, including the provision for ratable distributions of dividends of insolvent banks, and giving special emphasis to the fact that a national bank is without power to pledge its assets to secure a public or private deposit except in special cases as to public deposits under the Act of June 25, 1930, let us examine the nature of the privilege sought to be given by the Louisiana statute. The act is one by a state Legislature to regulate banks and banking. It gives a privilege on all the "property and assets" of any bank, state or national, to secure the payment of its check or draft issued in certain circumstances. No ingredient of a trust is required to obtain the privilege, but an ordinary banking transaction which, but for the act, would create a simple debt, is by mere legislative fiat converted into one creating a secured debt. The privilege attaches "whenever any bank shall send for collection to any other bank, domiciled in a different place, a check or draft drawn on the latter bank by a depositor of such drawee bank and such drawee bank shall have charged or debited the account of said depositor with said check or draft and shall have drawn a check or draft on any bank in representation of the amount thereof." Section 2. In other words, the special creditor named is accorded a privilege not by reason of superior equities but by legislative enactment. We have seen that it is incompatible with national banking laws for the assets of a national bank to be impressed with a lien to secure public deposits without federal statutory authority, even with the consent of the bank, and it seems to us at least equally incompatible for a privilege upon its assets to be given by state laws to secure its exchange or remittances as provided in the act under consideration. Numerous examples might be given of the inequality of such a rule in its actual operation. One man who pays cash for the bank's exchange may be subordinated in right to another whose paper was issued under the statute. Many opportunities for fraudulent practices readily suggest themselves. A few depositors, by complying with the requirement of sending checks for collection and remittances, might easily obtain privileges which would exhaust "all the property and assets of the bank." In practice, the statute would probably be dormant in ordinary times or with a solvent bank, but upon such a bank being insolvent or becoming unable to pay its depositors in cash, the statute might be invoked for the benefit of those favored by its terms. It is true that, as applied to state banks (where the Legislature has paramount authority), the statute by its terms is not conditioned upon insolvency and the privilege arises immediately upon the happening of the contingencies which are intended to give it life, but in practical operation the privilege will be of benefit only in cases of insolvency of the bank; and the intent of the state statute must be

judged by its practical operation and effect when the object is to ascertain whether it conflicts with a federal statute providing for the ratable distribution of the assets of an insolvent national bank. If the privilege given by Act No. 63 of 1926 had been expressly conditioned upon insolvency, there can be no doubt that it would fall within the principles announced in Davis v. Elmira Savings Bank, 161 U.S. 275, 16 S.Ct. 502, 40 L.Ed. 700. In that case (161 U.S. 275, at page 284, 16 S.Ct. 502, 504, 40 L.Ed. 700), the court said: "It cannot be doubted that one of the objects of the national bank system was to secure, in the event of insolvency, a just and equal distribution of the assets of national banks among all unsecured creditors; and to prevent such banks from creating preferences in contemplation of insolvency. This public aim in favor of all the citizens of every state of the Union is manifested by the entire context of the national bank act." At page 288 of the same case [161 U.S.], 16 S.Ct. 502, 506, 40 L.Ed. 700, the court said: "True it is that where, by state law, a lien is made to result from a particular contract, that lien, when its existence is not incompatible with the act of congress, will be enforced." If the present Louisiana act should be upheld, all that would be necessary to annul the decision in Elmira Savings Bank would be to amend the act there avoided by giving an immediate lien to all savings banks to secure their deposits.

The following statement in Texas & Pacific Railway Co. v. Pottorff, supra, with reference to a pledge (which places a lien on part of a bank's assets), is a fortiori applicable to a privilege upon a bank's entire property. The court said (291 U.S. 245, at page 255, 54 S.Ct. 416, 418, 78 L.Ed. 777): "To permit the pledge would be inconsistent with many provisions of the National Bank Act which are designed to ensure, in case of disaster, uniformity in the treatment of depositors and a ratable distribution of assets. Compare Davis v. Elmira Savings Bank, 161 U.S. 275, 290, 16 S.Ct. 502, 40 L.Ed. 700. This policy of equal treatment was held to preclude, in case of a national bank, even the preference under section 3466 of the Revised Statutes (31 U.S.C.A. § 191), which otherwise is accorded to the United States when its debtor becomes insolvent. Cook County National Bank v. United States, 107 U.S. 445, 2 S.Ct. 561, 27 L.Ed. 537. The effect of a pledge is to withdraw for the benefit of one depositor part of the fund to which all look for protection. Thereby the legitimate expectations of a great body of the depositors are defeated and confidence in the fairness of the national banking laws and administration is impaired."

Our conclusion is that, as here sought to be applied to national banks, the provision of said Act No. 63 giving a privilege is void.

Reversed and remanded for further proceedings not inconsistent with this opinion.