THOMPSON v. TWIN FALLS HIGHWAY
DIST. OF TWIN FALLS COUNTY,
STATE OF IDAHO.
No. 1930.

District Court, D. Idaho, S. D.
Jan. 11, 1937.

Chapman & Chapman, of Twin Falls, Idaho, for plaintiff.

M. J. Sweeley and Everett M. Sweeley, both of Twin Falls, Idaho, for defendant.

CAVANAH, District Judge.

This action is brought by the receiver of the Twin Falls National Bank against the Twin Falls Highway District to recover the sum of $3,279.09 claimed to have been illegally paid by R. H. Haas, the former receiver of the bank, from the proceeds of the sale of pledged bonds of the bank which had been deposited with the county auditor on January 19, 1929, to secure the deposits of the district in the bank, made prior to June 25, 1930. The bank was closed and taken charge of by the Comptroller of Currency on November 22, 1931. For many years prior to January 19, 1929, it had been a national banking association, under the laws of the United States and authorized to do business at Twin Falls, Idaho. The bonds, during the period from the time they were deposited by the county auditor until the sale on April 27, 1932, remained undisturbed. The bank did not repledge the bonds as security for any deposits of the district made between January 19, 1929, and June 25, 1930. Subsequently to the making of the pledge, various sums of money had been deposited by the district in the bank and of which $4,192.42 had not been withdrawn prior to the closing of it. After June 25, 1930, the district made deposits of its funds in the bank, and when it closed there was the sum of $10,052.89 of the district's on deposit which included the $4,192.42 deposited prior to June 25, 1930. The district then made a demand on the receiver for payment of the $10,052.89, and after March 19, 1932, filed a proof of claim with the receiver which was allowed by him as a secured one, and after that was done the receiver and the county auditor, for the purpose of paying the secured claim, caused the pledged assets

of the bank to be sold for $12,525.04 and paid from the proceeds of the sale of the bonds, to the district in payment of its demand and proof of secured claim, the sum of $10,-052.89, and interest of $116.67, under an order of the state district court, after the filing of a petition by the receiver for authority.

The facts have been stipulated and they substantially show the above and the account of the district in the bank from January 19, 1929, to November 22, 1931. It shows that the $4,192.42 of the sums deposited prior to June 25, 1930, remained in the account after the closing of the bank. The total amount on deposit in the account of June 25, 1930, was $13,456.86, and after deducting from it the total of all sums withdrawn from the account from that date until the date the bank closed, which was $9,264.44, there remained in the bank the amount of $4,194.42 of the amount deposited prior to June 25, 1930. The officers and directors of the bank knew that the moneys deposited were public moneys and at the time of the closing of it there was sufficient unpledged assets from which to pay in full the account of the district. The receiver has paid to date a dividend of 22 per cent.

Under the facts thus presented,.the propositions of law to be considered are:

First, was the act of the bank, a national banking association, in pledging its assets to secure deposits of public moneys made by the district, in the bank, prior to June 25, 1930, illegal, and if so, were the subsequent acts of the receiver and the county auditor taken for the purpose of carrying out the original pledge in approving and paying the proof of the secured claim of the district, invalid and unlawful?

Second, if the original pledge of the bank's bonds be illegal, could any act of the bank, after June 25, 1930, constitute a legal ratification of an illegal pledge of the assets of the bank to secure the deposits made prior to that time?

Third, if the original pledge is illegal and the acts taken pursuant thereto could not be legally ratified, were the deposits of the district made in the bank prior to June 25, 1930, trust property held ·by the bank for the district, and do the facts give rise to such a trust as will justify or sanction the payments made by the receiver of the district out of its assets? And,

Fourth, is the receiver now barred the relief sought by reason of the adjudication made by the state district court of the pledge, sale, and disposal of the assets of the Bank?

■ A national bank prior to June 25, 1930, was not granted authority to legally pledge its assets to secure deposits whether public or private. Act of June 3, 1864, 13 Stat. 113, § 45, Congress realizing that the original Act of 1864 did not grant such powers, adopted the Act of June 25, 1930, amending the original act, providing that a national bank can only do so legally, if it is located in a state in which other banks are so authorized by the state law. The amended act conferring the additional powers reads: "Any association may, upon the deposit with it of public money of a State or any political subdivision thereof, give security for the safe-keeping and prompt payment of the money so deposited, of the same kind as is authorized by the law of the State in which such association is located in the case of other banking institutions in the State." 46 Stat. 809, title 12 U.S.C.A. § 90. This construction of the national banking laws has been settled by the Supreme Court and the Ninth Circuit Court of Appeals in Texas & Pacific Railway Co. v. Pottorff, Receiver, 291 U.S. 245, 54 S.Ct. 416, 78 L.Ed. 777; City of Marion v. Sneeden, Receiver, 291 U.S. 262, 54 S.Ct. 421, 422, 78 L.Ed. 787; Lewis v. Fidelity & Deposit Co. of Maryland, 292 U.S. 559, 54 S.Ct. 848, 78 L.Ed. 1425, 92 A.L.R. 794; Utter, District Court Clerk, et. al. v. Eckerson (C.C.A.) 78 F.(2d) 307. .

In the case of City of Marion v. Sneeden, supra, where the question was before the court, it is said: "For the reasons stated in Texas & Pacific Ry. Co. v. Pottorff, 291 U.S. 245, 54 S.Ct. 416, 78 L.Ed. 777, decided this day, we are of opinion that the Act of 1864 did not confer the power to pledge assets to secure any public deposits. * * * A national bank could not legally pledge assets to secure funds of a state, or of a political subdivision thereof, prior to the 1930 amendment; and since then it can do so legally only if it is located in a state in which state banks are so authorized."

■ It is obvious that the deposits made prior to June 25, 1930, are the only ones concerned here, and as the bank could not then pledge its assets to secure them, the moneys when then deposited became a part of the common fund of the commercial department of the bank and were subject to the same risk as moneys of all other persons who made deposits in the bank and no act of the parties thereafter could have

been done which would have retroactively converted the common character of the deposits into preferred or secured deposits when the claimed security was prohibited by law, and therefore they are incapable of being ratified.

The very interesting and sound reasoning in sustaining this thought will be found in the decision of the Supreme Court of California in the case of Wood v. Imperial Irrigation District, 216 Cal. 748, 17 P.(2d) 128, 133, where the facts and the amendatory act of the state are similar to those involved in the present case, and it was there held that the deposits made prior to the amendatory legislation were not secured by the pledge given when the law did not authorize the giving of the pledge, nor was the pledge vitalized by the mere passing of a new law without repledging the security to secure the deposits made prior to the adoption of the law, and that the "statutes adopted with the view of authorizing banks to pledge their assets to depositors as security therefor must be strictly construed, and nothing should be . left to implication or doubtful construction. In the absence of clear statutory provisions authorizing such pledging of assets, the general policy of the. law will not sanction it."

Of course, it has long been settled by the courts of the United States when in construing the national banking laws that the public policy of the United States in relation to national banks appears in the acts of Congress, which have for their primary purpose the protection of all of the depositors of the bank alike, and no implied power exists to pledge the assets of a national bank as security for some of the depositors.

The further thought is urged by the district that even if it be held that the pledging of the bonds of the bank were illegal, yet the deposits by the districts were public moneys and are special deposits giving rise to trust funds which have a preference over other deposits in the bank, is untenable when we are forced to the conclusion that the pledging of the assets of the bank as security in the first instance were unauthorized by the law, and the district could not make the deposit without taking security for them. No trust arises, nor any preference would be justified merely upon the ground that the deposits were of public moneys. Nothing under such circumstances and the laws of the United States exists but a single debtor—creditor relationship between the public agency depositing the money and a depository bank. Texas & Pacific Ry. Co. v. Pottorff, supra; O'Connor et al. v. Rhodes, 65 App.D.C. 21, 79 F.(2d) 146; Ross v. Knott et al. (D.C.Fla.) 13 F.Supp. 963; Illinois Central R. Co. v. Rawlings (C.C.A.) 66 F.(2d) 146.

Lastly, has there been an adjudication in the state district court which concludes the receiver from the relief sought in the present action? The principle of law by which this question must be determined is well settled. The question relates to not one of authority but one of adjudication. The petition filed in the state district court was entitled "In the matter of the Receivership of the Twin Falls National Bank." By the petition the receiver prayed for an order of the court authorizing and permitting him to sell the bonds at a private sale which was the limit of the power of the court under title 12 U.S.C.A. section 192 and note, as it is there provided that the receiver under the direction of the Comptroller takes possession of the assets of the bank and upon order of a court of competent jurisdiction may sell all of the real and personal property of the bank on such terms as the court shall direct. The procedure there does not contemplate a trial in court nor place the affairs and assets of the bank under the jurisdiction and control of the court, for the statute seems clear that in the allowance and payment of claims against the bank that matter is exclusively vested in the receiver under the direction of the Comptroller. This is the interpretation given to the statute by the Supreme Court in the case of In re Chetwood, 165 U.S. 443, 458, 17 S.Ct. 385, 391, 41 L.Ed. 782, where the court said: "The receiver acts under the control of the comptroller of the currency, and the moneys collected by him are paid over to the comptroller, who disburses them to the creditors of the insolvent bank. Under section 5234 of the Revised Statutes [12 U.S. C.A. § 192 and note], when the receiver deems it desirable to sell or compound bad or doubtful debts, or to sell the real and personal property of the bank, it devolves upon him to procure 'the order of a court of record of competent jurisdiction,' but the funds arising therefrom are disbursed by the comptroller, as in the instance of other collections." This statute was also before the Ninth Circuit Court of Appeals in the case of Fifer et al. v. Williams, 5 F.(2d) 286, 288, where it is said: "In the present matter, as in the Chetwood Case, supra, the

application was entitled 'In the matter' of the receivership of the insolvent bank. By the application the receiver did not submit himself and the affairs of the bank to the jurisdiction of the court; nor did the presentation of the application operate to make the receiver an officer of the court, or place the assets of the bank under the control of the court 'in the sense in which control is acquired where a receiver is appointed by the court.' In re Chetwood, supra. He belongs to the executive branch of the government, and his custody of assets is not that of the court. Farrell v. Stoddard (D. C.) 1 F.(2d) 802. The procedure outlined by the statutes did not contemplate a trial in court. And no case is cited which lends support to the view that the statute intended that an objecting creditor could litigate with the receiver—who represents creditors and the insolvent bank—the question determined by him as to the advisability of disposing of the assets of the insolvent institution. There is no suit; no parties in the legal understanding of the term; no process must issue; no one is authorized to appear on behalf of the receiver or any one else, or to subpœna witnesses. It is an ex parte proceeding, and, though by the will of Congress put under judicial cognizance, is not by its own nature a judicial controversy. The fact that, when the receiver filed his application, the judge sought information and directed that notice be published that the court would hear persons interested in the insolvent bank upon the question of the proposed sale, does not change the administrative character of the proceeding. The course followed was, evidently, out of a cautious wish to gain advice that would be helpful in finally determining whether or not the order applied for by the receiver should be granted. Ex parte Cockcroft, 104 U.S.[578] 579, 26 L.Ed. 856. No statute gave to the objectors any legal right to demand to be heard or to be made parties to the proceeding; nor is there any statutory provision for an appeal from an order for the sale of the assets of an insolvent national bank."

■ The state district court under the federal statute not having power to decide the question as to the legality of the deposit or to disburse it, or whether the pledge of the assets of the bank was legal, may not assume jurisdiction to adjudicate these questions, and therefore its order was limited to authorizing the sale of the bonds and the terms thereof and nothing more. To constitute an adjudication and bar to further consideration of a litigated question there must have been at some prior time, a judicial determination of the controversy. That has not been done under the record and the doctrine of res adjudicata could not be invoked in the present case.

In view of the conclusion reached that the pledge failed because of being illegal, the district is entitled only to a dividend as a general creditor and the relief prayed for by the plaintiff in his complaint, for the recovery of $3,279.09 due and interest, being the balance of the $4,192.42, is granted with costs.

Findings and decree to be prepared by counsel for the plaintiff and submitted to counsel for the defendant and the court within ten days.