**In re NBW COMMERCIAL PAPER LITIGATION.**

**AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, Plaintiff,**

v.

**FEDERAL DEPOSIT INSURANCE CORPORATION, in its capacity as receiver of The National Bank of Washington, Defendant.**

**Master File No. 90–1755 (RCL).**
**Civ. A. No. 91–0626 (RCL).**

United States District Court,
District of Columbia.

Dec. 11, 1992.

See also 807 F.Supp. 801.

William F. Sheehan, Christopher E. Palmer, Shea & Gardner, Washington, DC, for plaintiff.

Abraham D. Sofaer, William R. Stein, Robert P. Reznick, Lawrence F. Bates, Hugues, Hubbard & Reed, Burton H. Finkelstein, Finkelstein, Thompson & Loughran, Washington, DC, for defendant.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

This case comes before the court on AFSCME's Renewed Motion for Summary Judgment on Count I of its Complaint ("AFSCME Motion"); Memorandum of FDIC in Opposition to AFSCME's Renewed Motion for Summary Judgment and in Support of FDIC's Cross-motion for Summary Judgment on Count I ("FDIC Motion"); Reply Memorandum in Support of AFSCME's Renewed Motion for Summary

Judgment on Count I of its Complaint and in Opposition to the FDIC's Motion for Summary Judgment ("AFSCME Reply"); Reply Memorandum of FDIC in Support of its Cross-motion for Summary Judgment on Count I; Brief of the Securities and Exchange Commission, *Amicus Curiae* ("SEC Brief"); Response of FDIC to Brief of the Securities and Exchange Commission, *Amicus Curiae* ("FDIC SEC Response"); Response of the Individual Defendants to AFSCME's Motion for Summary Judgment against the Federal Deposit Insurance Corporation; AFSCME's Reply to the Individual Defendants' Opposition to AFSCME's Motion for Summary Judgment against the FDIC; and the Statements of Material Facts in Dispute and the Statements of Material Facts not in Dispute submitted by both sides.

Upon consideration of the representations made by counsel in their briefs, and for the reasons stated below, the court finds that AFSCME has satisfied the criteria necessary for summary judgment on Count I of its complaint.

## I. INTRODUCTION AND HISTORY.

Starting in 1984 and continuing through 1990, Washington Bancorporation ("WBC"), a District of Columbia bank holding company, issued commercial paper, largely to raise capital for its subsidiary, Washington Mortgage Group. This commercial paper, with maturities of as little as one day and amounting to as much as approximately $55 million, was sold only through another WBC subsidiary, the National Bank of Washington ("NBW"). (NBW comprised approximately 91 percent of WBC's assets at the end of 1989, and many of the directors and officers served both entities.)

In early 1990, WBC faced dire economic straits. By May 4, 1990 (by which time, WBC had reduced its outstanding commercial paper obligations to around $37 million), WBC had no lines of credit with which to back its commercial paper obligations and precious few liquid assets.

On May 4, 1990, AFSCME purchased $1.8 million in WBC commercial paper from the Treasury Services Department of NBW. This commercial paper was set to mature on May 7, 1990 (the next business day). On May 7, however, WBC ceased issuing commercial paper and declared a default on all paper then outstanding. Three months later, WBC filed for protection under Chapter 11 of the Bankruptcy Code, and the FDIC was appointed conservator of NBW; shortly thereafter, the OCC appointed FDIC as receiver.

This case is one of more than forty brought by purchasers of WBC commercial paper against NBW and the FDIC as receiver for NBW; these cases have been consolidated as *In re NBW Commercial Paper Litigation*, Master File No. 90–1755 (RCL) (D.D.C.). The parties have designated that *AFSCME v. FDIC* shall be a "test" case in the litigation.

Thus far, the court has denied the FDIC's motion to dismiss as to Count I of AFSCME's complaint (Mem. Op., Mar. 10, 1992). (On the same date, the court also denied the FDIC's motion to dismiss as to two other counts and granted the FDIC's motion as to the remaining seven counts.) The remaining claim, Count I, is a claim under §§ 5 and 12(1) of the Securities Act of 1933, 15 U.S.C. §§ 77e and 77*l*(1), by which AFSCME asserts that NBW, as an alleged seller of an unregistered security, is liable to AFSCME for the value of the security.

The case now comes before the court on the parties' cross motions for summary judgment as to Count I.

## II. DISCUSSION.

In order to prove a claim under § 12(1) of the Securities Act of 1933, 15 U.S.C. § 77*l*(1) [1], the plaintiff must demonstrate that the defendant offered or sold a security in violation of § 5 of the Act (15

---

1. 15 U.S.C. § 77*l* reads, in pertinent part:
 Any person who—
 (1) offers or sells a security in violation of section 77e of this title ...

 shall be liable to the person purchasing such security from him. ...

U.S.C. § 77e). Thus, AFSCME's prima facie case includes three [2] elements:

1. that the WBC commercial paper falls within the statutory definition of "security;"

2. that NBW was a "seller" of the WBC commercial paper for purposes of the act; and

3. that the commercial paper was not registered as required by § 5.[3]

In order to grant summary judgment on Count I, as AFSCME asks, the court must find that there is "no genuine issue as to any material fact." Fed.R.Civ.P. 56. *See Lujan v. National Wildlife Federation*, 497 U.S. 871, 884, 110 S.Ct. 3177, 3186, 111 L.Ed.2d 695 (1990).

Each of the elements will be addressed in turn.

**A. The WBC Commercial Paper Was a "Security."**

▆ In order to recover from the defendant, AFSCME must first demonstrate that the WBC commercial paper [4] NBW sold to AFSCME was a "security" for purposes of the Securities Act of 1933. Although the definition of security would appear to be reasonably clear from the act itself, the Supreme Court has never specifically held that commercial paper qualifies as a security under § 12(1) of the Act.

The parties cite two cases to the court on the issue, *Securities Industry Ass'n v. Board of Governors*, 468 U.S. 137, 104 S.Ct. 2979, 82 L.Ed.2d 107 (1984) (referred to as "*Bankers Trust I*"), and *Reves v. Ernst & Young*, 494 U.S. 56, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990). The court holds that the former case, *Bankers Trust I*, provides the proper context for determining the scope of the term "security" in the present case; under that analysis, the WBC commercial paper is properly termed a security. However, even if the *Reves* standards describes the appropriate test, the court holds that the WBC commercial paper is nonetheless properly termed a security under the 1933 Act.

**1. Bankers Trust I.**

In *Bankers Trust I*, the Court faced the issue of whether § 16 of the Banking Act of 1933 (commonly known as the Glass-Steagall Act) prohibited commercial banks from underwriting commercial paper. After examining the language and the purposes of the Act, the Court determined that commercial paper was indeed a security. As the Court stated, there is "considerable evidence to indicate that the ordinary meaning of the term 'security' and 'note' as used by the 1933 Congress encompasses commercial paper." *Bankers Trust I*, 468 U.S. at 150, 104 S.Ct. at 2986. For instance, in the definition section of the Act, § 2(1) (77 U.S.C. § 77b(1)), the term "security" is given an open-ended, extremely broad definition: "any note, stock, treasury stock, bond, debenture, etc." *Id.* In addition, the Court noted that "[i]n each of [the securities and banking] statutes, the definition of the term 'security' includes commercial paper, and each statute contains explicit exceptions where Congress meant for the provision of an Act not to apply to commercial paper." 468 U.S. at 150–51, 104 S.Ct. at 2987. Among the statutes included in the Court's discussion was the Securities Act of 1933 (at issue here today); specifically highlighted was § 12 of that act (15 U.S.C. § 77*l*). Finally, the Court examined the purposes of the Banking Act and determined that Congress' intention of protecting the banks from imprudent underwriting required that commercial paper be included within the definition of security.

---

**2.** The independent defendants assert that a fourth element, loss causation, must also be proven. As discussed in Part II.D., below, however, § 12(1) does not require the plaintiff to prove loss causation.

**3.** The FDIC has attempted to demonstrate that the commercial paper was not registered because it qualified for an exemption under either § 3(a)(3) or § 4(2) (15 U.S.C. §§ 77c(a)(3) & 77d(2), respectively). This argument is considered in Part II.C., below.

**4.** "'Commercial paper' refers generally to unsecured, short-term promissory notes issued by commercial entities." *Securities Industry Ass'n v. Board of Governors*, 468 U.S. 137, 140 n. 1, 104 S.Ct. 2979, 2981 n. 1, 82 L.Ed.2d 107.

Although part of the Court's discussion is dicta, it nevertheless demonstrates that, to the 1933 Congress, the common understanding of the term "security" included commercial paper.[5] Moreover, this interpretation fulfills the goals of the Securities Act. With this in mind, the court today holds that the WBC commercial paper is a security for purposes of § 12(1).

### 2. *Reves.*

The defendant claims first that the Court in *Bankers Trust I* dealt solely with the Glass–Steagall Act and merely held that commercial paper is like any other "note." Moreover, even if the Court adopted a broader definition of the term "security" in *Bankers Trust I,* the FDIC asserts that the Court narrowed that definition six years later in *Reves.* The court today concludes that the Supreme Court did not alter its statements in *Bankers Trust I* concerning the breadth of the definition of "security." Even if the *Reves* test applies, however, the WBC commercial paper is still a security under the Act.

In *Reves,* the Court had to determine whether promissory notes issued by a farmers cooperative qualified as securities under § 3(a)(10) of the 1934 Securities Act.[6] Recognizing that Congress "enacted a definition of 'security' sufficiently broad to encompass virtually any instrument that might be sold as an investment," *Reves,* 494 U.S. 56, 61, 110 S.Ct. 945, 949, and noting that the Securities Acts define "security" to include "any note," the Court determined that analysis of notes must begin with a rebuttable presumption that every note is a security. 494 U.S. at 65, 110 S.Ct. at 951.

The Court then delineated a four-part analysis to determine the characteristics of a note which would rebut the general presumption. 494 U.S. at 66, 110 S.Ct. at 952. Those criteria include: first, an examination of the transaction "to assess the motivations that would prompt a reasonable seller and buyer to enter into it[;]" second, an examination of "the 'plan of distribution' of the instrument[;]" third, an examination of "the reasonable expectations of the investing public[;]" and fourth, an examination of "whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary." 494 U.S. at 66–67, 110 S.Ct. at 952.

The application of these standards to the present case sufficiently indicates that the WBC commercial paper qualifies as a "security" for purposes of the 1933 Act.[7]

(1) The first standard looks to the intentions of both parties to the transaction. From the buyer's side, notes are more likely to be considered securities if the buyer is interested in profits or in investment rather than in the financing appurtenant to a sale. As for the seller, securities are more likely found in the raising of money for the general use of a business rather than in advancing "some other commercial or consumer purchase." 494 U.S. at 66, 110 S.Ct. at 952. Here, investors were lured to WBC commercial paper, among other ways, by NBW's catalog of Investment Services. There, commercial paper is listed as an *investment* which offers "a high return for fixed maturities." AFSCME Appendix[8], ex. 7 at 6. Another brochure, this one issued by the Treasury Services Department, noted that commercial paper offered

---

**5.** The D.C. Circuit later reached the same conclusion. *Securities Industry Ass'n v. Board of Governors,* 807 F.2d 1052, 1063 (D.C.Cir.1986).

**6.** Although *Reves* dealt particularly with the 1934 Securities Act, the Court acknowledged that the definition of a security in 1934 Act is "virtually identical" to the definition in the Securities Act of 1933. 494 U.S. at 61 n. 1, 110 S.Ct. at 949 n. 1.

**7.** It should be noted that no one of these four criteria is crucial, and the failure of one will not automatically result in a determination that the note in question is not a security. Rather, a balancing of the four must be conducted in order to determine whether, on the whole, the note looks more like a security than not. In the present case, nonetheless, all four factors point in the direction of a finding that the WBC commercial paper is a security.

**8.** "AFSCME Appendix" refers to the AFSCME's Appendix to its Motion for Summary Judgment on Count I of its Complaint.

"*investment* opportunities." FDIC Appendix [9], ex. 11 at 4 (emphasis added). As for the seller's intentions, the NBW Investment Services catalog stated that commercial paper was used "by a large corporation or finance company to raise working capital." AFSCME Appendix, ex. 7 at 6. The brochure than cites Washington Bancorporation of an example of such a company. Although the FDIC attempts to argue that AFSCME used the commercial paper in cash management, FDIC Motion at 31, that assertion does not preclude a finding that AFSCME's investment in commercial paper was just that: an investment. This comports with *Reves*, 494 U.S. at 68, 110 S.Ct. at 953, in which "one of the primary inducements offered purchasers was an interest rate constantly revised to keep it slightly above the rate paid by local banks," much like the slightly elevated rates promised investors here.

(2) The second criterion examines the plan of distribution "to determine whether it is an instrument in which there is 'common trading for speculation or investment.'" 494 U.S. at 66, 110 S.Ct. at 952 (citation omitted). The FDIC asserts that WBC commercial paper was sold to a limited number of sophisticated purchasers, was sold solely in large denominations, and was only available through NBW's Treasury Services department, not through branch offices. FDIC Motion at 31. Thus, it concludes, the plan of distribution is too limited to term the WBC commercial paper a security. However, the commercial paper was offered to the public in NBW's Investment Services brochures and several individuals—including at least 11 of the 49 holders of WBC commercial paper as of May 7, 1990, FDIC Appendix, Ex. 35, Exhibit YY (*see also* SEC Brief at 20)—purchased the commercial paper, often for as little as $25,500. *See* AFSCME Appendix, Ex. 36, Exhibit A–3.1. Although the majority of the purchases may have been for large amounts and may have been made by sophisticated current customers of NBW, the fact that several individuals also purchased the investment indicates that there was common trading for investment: the commercial paper was "offered and sold to a broad segment of the public, and that is all [the Supreme Court has] held to be necessary to establish the requisite 'common trading' in an instrument." 494 U.S. at 68, 110 S.Ct. at 953.

(3) The third prong of this examination looks to the reasonable expectations of the public. Given the brochures mentioned at part (1), above, it is clear that NBW included commercial paper as just one of the many "investments" available to its customers. The FDIC argues that the limited universe of customers precludes any finding of a general "public," FDIC Motion at 31, but that argument is belied by the plain language of the circulars, which is aimed at the general public. Moreover, the circulars apparently were left behind at potential customers' offices after sales calls. FDIC Appendix, ex. 8, pp. 108–111. In short, although the entire investing public of Washington, D.C., might not have been aware of the opportunity to "invest" in WBC commercial paper at NBW, NBW did present commercial paper to its customers, the relevant public, as an investment. Therefore, the court concludes that NBW customers—potential or actual—could reasonably conclude that the purchase of commercial paper was an investment, *see Reves*, 494 U.S. at 69, 110 S.Ct. at 953.

(4) The final factor looks to other regulatory schemes to determine whether application of the Securities Acts is rendered unnecessary. *See Marine Bank v. Weaver*, 455 U.S. 551, 102 S.Ct. 1220, 71 L.Ed.2d 409 (1982). The FDIC points to the regulation of WBC by the Federal Reserve Board, the regulation of NBW by OCC, and the public disclosure concomitant with NBW's status as a publicly-traded company as indications that further regulation is unnecessary. FDIC Motion at 32–33. None of these, however, provides sufficient protection to the *investor*, the goal of the Securities Acts and of this portion of the analysis.

9. "FDIC Appendix" refers to the two-volume Evidentiary Appendix to Memorandum of FDIC in Opposition to AFSCME's Renewed Motion for Summary Judgment and in Support of FDIC's Cross-motion for Summary Judgment on Count I.

For instance, the Federal Reserve Board—as well as the statutes cited by the FDIC—is designed to ensure the stability of banks and bank holding companies, not to protect the investor. *See* 12 U.S.C. § 1844(e). Although it can be argued that Board oversight ultimately will benefit the investor, it does so only indirectly. Moreover, the interests of the banking laws (protecting banks) and the interests of investors often diverge, thus salvaging banks at the expense of investors. *See Holloway v. Peat, Marwick, Mitchell & Co.*, 879 F.2d 772, 788 (10th Cir.1989), *vacated and remanded on other grounds*, 494 U.S. 1014, 110 S.Ct. 1314, 108 L.Ed.2d 490, *aff'd*, 900 F.2d 1485 (10th Cir.1990). Similarly, in the interest of benefiting NBW, the OCC prevented payment of moneys by NBW to WBC which could have been used to pay off the investors' commercial paper debts; thus, instead of rendering the Securities Acts unnecessary, OCC oversight actually left the Securities Acts as the *only* protection for holders of WBC commercial paper. Finally, the revelations made by WBC as a publicly-traded entity did not sufficiently apprise potential investors of the risks inherent in investing in WBC commercial paper. The only protection these investors could have had on these "uncollateralized and unsecured" notes, *see Reves*, 494 U.S. at 69, 110 S.Ct. at 953, would have been through regulation under the Securities Act. *Pinter v. Dahl*, 486 U.S. 622, 638, 108 S.Ct. 2063, 2074, 100 L.Ed.2d 658 (1988).

Thus, all four criteria point to the conclusion that, even if *Reves* were to provide the appropriate standard, there is no genuine issue of material fact as to whether WBC commercial paper is a security for purposes of the Securities Act of 1933. It is.

B. *NBW Was a "Seller."*

 Section 12(1) imposes strict liability on any person who "offers or sells a security" in violation of the registration requirement of the Securities Act. 15 U.S.C. § 77*l*(1). Congress did not, however, clearly "delineat[e] who may be regarded as a statutory seller, and the sparse legislative history sheds no light on the issue." *Pinter v. Dahl*, 486 U.S. 622, 642,

108 S.Ct. 2063, 2076, 100 L.Ed.2d 658 (1988). Nonetheless, the facts in this case make it abundantly clear that, by whatever standard, NBW was a seller of WBC commercial paper for purposes of § 12(1).

In *Pinter*, the Court faced the question of whether an investor in unregistered oil securities faced liability under § 12(1) after he solicited other investors into the failed scheme. The Court first examined the language of the statute and determined that ownership or transference of title were not necessary elements for liability to attach. Rather, "a securities vendor's agent who solicited the purchase would commonly be said, and would be thought by the buyer, to be among those 'from' whom the buyer 'purchased,' even though the agent himself did not pass title." *Pinter*, 486 U.S. at 644, 108 S.Ct. at 2077. Moreover, the Court concluded that "Congress' express definition of 'sells' in the original Securities Act to include solicitation suggests that the class of those from whom the buyer 'purchases' extended to persons who solicit him." 486 U.S. at 645, 108 S.Ct. at 2077. The Court explained its ultimate decision thus: "An interpretation of statutory seller that includes brokers and others who solicit offers to purchase securities furthers the purposes of the Securities Act—to promote full and fair disclosure of information to the public in the sales of securities." 486 U.S. at 646, 108 S.Ct. at 2078.

In this case, NBW clearly served as an agent for WBC. NBW was a wholly-owned subsidiary of WBC, AFSCME Appendix, ex. 4 at 11, and NBW constituted approximately 90 percent of WBC's consolidated assets. *Id.* Moreover, NBW employees performed all of WBC's activities, as WBC had no employees, AFSCME Appendix, ex. 5 at 1, 5, and many of the officers and directors served both entities. AFSCME Appendix, ex. 4 at 51–53. And, in fact, NBW was the only seller of WBC commercial paper. Thus, NBW clearly was the agent of WBC, the title owner of the commercial paper. Thus, at first glance, NBW qualifies as a statutory seller.

However, there are two arguments which, if successful, would nonetheless absolve NBW of liability.

The first argument, strenuously urged by the FDIC and the individual defendants, is based on the *Pinter* framework as further interpreted by the Eleventh Circuit Court of Appeals in *Ryder Int'l Corp. v. First American Nat'l Bank*, 943 F.2d 1521 (11th Cir.1991). Under this interpretation, only an entity which engages in "active solicitation" may be liable under § 12(1). FDIC Motion at 9.

However, this reading misconstrues the Court's purpose in *Pinter*. In examining, and ultimately rejecting, the substantial-factor test used by the Fifth Circuit, the Court worried that a too-broad reading of seller "might expose securities professionals, such as accountants and lawyers, whose involvement is only the performance of their professional services, to § 12(1) strict liability for rescission. The buyer does not, in any meaningful sense, 'purchas[e] the security from' such a person." *Pinter*, 486 U.S. at 651, 108 S.Ct. at 2081. The Court therefore limited solicitation to exclude these non-integral parties. However, it cannot reasonably be argued that NBW fits into this exclusion. Rather, NBW played a significant role in the marketing of WBC commercial paper, including listing it in its sales brochures. In fact, NBW was the only seller of WBC commercial paper to the public, and if NBW is not liable, there can be no liability under § 12(1) (which only allows for recovery from the immediate purchaser, *see Pinter*, 486 U.S. at 644 n. 21, 108 S.Ct. at 2077 n. 21). Such a conclusion is untenable.

The primary case the FDIC relies upon, *Ryder*, also offers no support for the FDIC's strained reading of *Pinter*. In that case, the court faced a § 12(2) (not § 12(1)) claim by Ryder against a bank, First American, for the sale of a security which failed. Unlike this case, however, the bank merely took the order of Ryder's employee and fulfilled the sale. Although the court noted that the buyer's agent (the bank) would not be liable due to the fact that it did not actively solicit the purchase, the court also stated that "in contrast to a *buyer's* agent it would be uncommon for a *seller's* agent not to engage in solicitation if he or she is hired to sell a principal's securities." *Ryder*, 943 F.2d at 1531 (emphasis in original).

In contrast, although NBW may have merely taken AFSCME's order for commercial paper on May 4, 1990, the totality of the circumstances indicates that solicitation was present. First, the court must consider the reality of commercial paper, which typically is used as a roll-over investment on a short-term, even daily, basis; this is unlike the longer term notes in *Ryder*. Second, the court notes that many NBW customers invested in WBC commercial paper, thus further distinguishing this case from *Ryder*, in which only one of First American's customers (Ryder itself) purchased the failed security. As the *Ryder* court held that this alone belied the suggestion that the bank was actively selling the security, 943 F.2d at 1533 n. 17, this court, in contrast, concludes that the great number of NBW investors who invested in WBC commercial paper belies the argument that NBW was *not* soliciting sales of WBC commercial paper. Finally, a finding that NBW solicited AFSCME in this case also furthers the ends of the securities laws. The *Ryder* court noted that "[t]he securities laws were enacted in large part to curb conflicts of interest created by the combination of banking and securities activities." *Ryder*, 943 F.2d at 1534. Given the integral connection between NBW and WBC, conflict of interest is rampant in this case. The court therefore concludes that the FDIC's reading of *Pinter* is erroneous; moreover, the court determines that NBW did solicit AFSCME to purchase WBC commercial paper.

The FDIC derives a second possible way of avoiding liability from the statutory requirement that the sale be made "for value." 15 U.S.C. § 77b(3). *See Pinter*, 486 U.S. at 647, 108 S.Ct. at 2078. The *Ryder* court also recognized that "liability extends only to one who solicits a purchase *and* is 'motivated at least in part by a desire to serve his own financial interests or those of the securities owner.'" *Ryder*, 943 F.2d at 1526 (quoting *Pinter*, 486 U.S. at 647, 108

**16**

S.Ct. at 2078) (emphasis in original). Given the integral correlation between NBW and WBC, however, there is no question that NBW was motivated by its own financial interest as well as that of WBC when it sold the paper (unlike the *Ryder* case where the link between the issuer and the bank was more attenuated). Therefore, the second possible exclusion also is unavailing.

The court thus concludes that NBW is a statutory seller of the WBC commercial paper and is therefore liable to those who purchased the paper from it under § 12(1).

### C. *The WBC Commercial Paper Was not Exempt from Registration.*

■ The WBC commercial paper was not registered. This fact alone usually satisfies the third element of plaintiff's prima facie case. However, the FDIC asserts that, even if the first two criteria are met, NBW did not violate § 5 (and therefore § 12(1)) because the WBC commercial paper was not required to be registered. The FDIC claims that two exemptions apply to the WBC commercial paper: § 3(a)(3) and § 4(2) (15 U.S.C. § 77c(a)(3) & 77d(2), respectively).[10] The court holds that neither of these statutory exemptions apply to the WBC commercial paper.

#### 1. § 3(a)(3).

The FDIC argues that this statutory exemption is facially clear: any note with a maturity of less than nine months is exempted. Thus, concludes the FDIC, the WBC commercial paper, which had a maturity in this case of three days (one business day), fits within the exemption. In addition, the Supreme Court in *Bankers Trust I* mentions in dicta that commercial paper was specifically exempted from the registration requirements of the statute. *Bank-*

*ers Trust I,* 468 U.S. 137, 151 & n. 7, 104 S.Ct. 2979, 2986–87 & n. 7, 82 L.Ed.2d 107 (1984).

Despite the FDIC's attempt to simplify this issue, however, the court finds that the broad provision included in § 3(a)(3)[11] does not exempt the WBC commercial paper from registration. Rather, the legislative history of the Act, the changing field of securities investment, and the later interpretations of courts addressing this issue demand that a less broad interpretation be given to § 3(a)(3). Only with this narrower interpretation of § 3(a)(3) may the primary purpose of the Securities Act—the "protect[ion of] investors by requiring publication of material information thought necessary to allow them to make informed investment decisions concerning public offerings of securities in interstate commerce," *Pinter,* 486 U.S. at 638, 108 S.Ct. at 2074—be achieved.

##### a. Statutory interpretation and securities laws.

The Supreme Court, in interpreting provisions of the Securities Act and its relatives, has often acknowledged the significance of legislative history. *See, e.g., Bankers Trust,* 468 U.S. at 152, 104 S.Ct. at 2987. For instance, in *Reves,* the Court "interpret[ed]" an analogous provision in 15 U.S.C. § 78c(a)(10) (excluding from coverage of the act "any note ... which has a maturity at the time of issuance of not exceeding nine months") to not apply to demand notes "[i]n light of Congress' broader purpose in the Acts of ensuring that investments of all descriptions be regulated to prevent fraud and abuse." *Reves,* 494 U.S. 56, 73, 110 S.Ct. at 955. The Court quite specifically implied that, although it did not need to determine at this time whether "the plain words of the [statute] are dispositive," 494 U.S. at 70, 110 S.Ct. at 954, the plain words would not

---

**10.** The burden of demonstrating these exemptions falls on the FDIC.

**11.** 15 U.S.C. § 77c(a)(3) reads, in pertinent part:
(a) ... the provisions of this subchapter shall not apply to any of the following classes of securities: ...
 (3) Any note, draft, bill of exchange, or banker's acceptance which arises out of a

current transaction or the proceeds of which have been or are to be used for current transactions, and which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

apply if such language contravened Congress' intent. Moreover, even though the statute clearly exempted "all notes" with maturities of less than nine months, the Court disregarded the theory that "Congress intended to create a bright-line rule exempting from the 1934 Act's coverage [12] *all* notes of less than nine months' duration." 494 U.S. at 73, 110 S.Ct. at 955.

In addition to examining legislative history, the Supreme Court has similarly noted that courts must look to the economic reality of transactions when interpreting the securities laws: "In discharging our legal duty, we are not bound by legal formalisms, but instead take account of the economics of the transaction under investigation." *See, e.g., Reves,* 494 U.S. at 61, 63, 110 S.Ct. at 949, 950 (1990); *Tcherepnin v. Knight,* 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967). Thus, in *Reves,* the Court held that "the phrase 'any note' should not be interpreted to mean literally 'any note,' but must be understood against the backdrop of what Congress was attempting to accomplish in enacting the Securities Acts." 494 U.S. 56, 63, 110 S.Ct. 945, 950. Since regulating some types of "notes" would contravene Congress' intent (as determined by the courts), courts have simply modified the definition of "note" to exclude these unwanted types.

When these two indicia—legislative intent and economic reality—are applied, as in *Reves,* to a statute in the Securities Act, the result may appear counterintuitive. For instance, the "any note" language at issue in *Reves* merely created a *presumption* that a note would be a security. 494 U.S. at 65, 110 S.Ct. at 951. Instead of taking the statutory language at face value, the Court held that a note is *not* a security if the above presumption were rebutted by the application of a four-part

analysis. In other words, the Court indicated that, in some cases, it is necessary to interpret certain provisions of the Securities Acts in order to ensure that Congress' intent will be implemented.

b. Legislative intent of § 3(a)(3) and the economic reality of commercial paper.

In 1961, the Securities and Exchange Commission issued its interpretation of the proper scope of § 3(a)(3):

The legislative history of the Act makes clear that section 3(a)(3) applies only to prime quality negotiable commercial paper of a type not ordinarily purchased by the general public, that is, paper issued to facilitate well recognized types of current operational business requirements and of a type eligible for discounting by Federal Reserve banks.

SEC Release No. 33–4412, 26 Fed.Reg. 9158 (1961). This provision has generally been acknowledged by the courts of appeals, and specifically adopted by the Second and Seventh Circuits. *See SEC v. American Bd. of Trade,* 751 F.2d 529 (2d Cir.1984); *Hunsinger v. Rockford Business Credits, Inc.,* 745 F.2d 484 (7th Cir. 1984); *Zeller v. Bogue Elec. Mfg. Corp.,* 476 F.2d 795 (2d Cir.), *cert. den'd,* 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146 (1973); *Sanders v. John Nuveen & Co.,* 463 F.2d 1075 (7th Cir.), *cert. den'd,* 409 U.S. 1009, 93 S.Ct. 443, 34 L.Ed.2d 302 (1972). On the other side of the balance, no court addressing the subject has rejected the SEC's interpretation.[13] In short, the SEC release states that only prime quality commercial paper which is not generally available to the public qualifies for the § 3(a)(3) exemption.[14]

The SEC's interpretation is consistent both with the legislative history of the 1933 Securities Act and with the eco-

---

**12.** As mentioned earlier, *see* note 6, the applicability of this exception in the 1933 and 1934 Acts is virtually analogous.

**13.** The Supreme Court has not addressed the controversy, likely because there is no split among the circuits.

**14.** The SEC argues in its *amicus* brief that four criteria are inherent in the release. SEC Brief

at 39. However, the "that is," indicates that the second two criteria (dealing with business requirements and discounting) are not independent criteria but rather modifiers of the first two criteria ("prime quality" and "not ordinarily purchased by the general public"). Thus, the court applies only the first two criteria in its analysis.

nomic reality of commercial paper in 1933 and today. As stated above, the purpose of the Securities Act was to provide for the safety of the investing public. Moreover, the legislative history of § 3(a)(3) demonstrates that the purpose of the exclusion is to exempt from the coverage of the Acts only commercial paper—short-term, high quality instruments issued to fund current operations and sold only to highly sophisticated investors. *See* S.Rep. No. 47, 73d Cong., 1st Sess., 3-4 (1933); H.R.Rep. No. 85, 73d Cong., 1st Sess., 15 (1933). This commercial paper was almost exclusively purchased by banks and commercial paper dealers, not by unsophisticated parties like the ordinary public, and had a record of safety comparable to government bonds. *See Federal Securities Act, 1933: Hearings on S. 875 before the Senate Committee on Banking and Currency*, 73d Cong., 1st Sess. 94 (1933).

However, commercial paper has evolved into a riskier transaction in which the general public now partakes. In fact, as many as twenty percent or more of the holders of WBC commercial paper were in fact individuals, not sophisticated banks or commercial paper dealers. In light of the changed economic circumstances and in order to ensure that the investing public receives the safeguards Congress intended, the broad statutory exemption enacted by Congress is not tenable.

c. The present scope of § 3(a)(3).

■ Thus, the court today holds that the exemption created by § 3(a)(3) creates a presumption that any security with a duration of less than nine months is exempted from the scope of the statute. However, as with the presumption that a note is a security created by the Supreme Court in *Reves*, this presumption is rebuttable with evidence that sales are made to the public (or other unsophisticated investors) *and* that the investments are of less-than-prime quality.[15]

The FDIC claims that the imprecision of the "prime quality" definition leaves issuers of commercial paper unclear as to whether they must register that offering. However, the disadvantage to the issuer is outweighed by the advantages to the investing public. First, if their is doubt as to whether an offering is of "prime quality," the issuer should register the investment; thus, Congress' intent—promoting "full and fair disclosure of information to the public in the sales of securities," *Pinter*, 486 U.S. at 646, 108 S.Ct. at 2078—is fulfilled. Moreover, as the Supreme Court noted in *Reves*, this method introduces flexibility into the Securities Act and thus accords the SEC and the courts sufficient oversight over the securities market. 494 U.S. at 63 n. 2, 110 S.Ct. at 950 n. 2.

d. Application of this standard to WBC commercial paper.

■ When this analysis is applied to WBC commercial paper, it is clear that the WBC commercial paper does not qualify for the § 3(a)(3) exemption. Given the short duration (one business day) of the commercial paper, the court first presumes that the § 3(a)(3) exemption applies. However, the commercial paper fails both criteria, thus disqualifying it for the exemption.

First, the WBC commercial paper is hardly prime quality. As of May 4, 1990, the WBC commercial paper's rating was very poor or nonexistent. Moreover, there were no backup lines of credit in place to pay off the obligations should the holding company fail. In addition, WBC had few if any liquid assets with which to pay off any obligations coming due. Finally, WBC failed only hours after NBW sold the commercial paper to AFSCME. These indications leave no question but that the paper meets no reasonable definition of prime quality.[16] Second, the record indicates that NBW offered and sold WBC commercial paper to members of the general public, sophisticated or not, so long as they had $25,000 to invest. *See* Part II.A., above.

---

15. In keeping with the purposes of the statute, the presumption is successfully rebutted only if *both* elements are met.

16. The FDIC's argument seems to suggest that any commercial paper may be termed "prime quality." FDIC Motion at 24. The court rejects this tautological interpretation.

Thus, the court concludes that, despite the presumption, the WBC commercial paper is not exempt from registration under § 3(a)(3).[17]

### 2. § 4(2).

The FDIC also argues that genuine issues of fact remain as to whether § 4(2), 15 U.S.C. § 77d(2)[18], applies to WBC commercial paper. FDIC Motion at 33. Quoting from *SEC v. Ralston Purina Co.*, 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494 (1953), the FDIC asserts that this section applies when an individual has "access to the same kind of information that the 1933 Act would make available in the form of a registration statement." FDIC Motion at 33 (quoting *Ralston Purina* at 125–26, 73 S.Ct. at 985). The statutory standard is met, according to the FDIC (citing *SEC v. Murphy*, 626 F.2d 633, 647 (9th Cir.1980)), "where, in light of all the circumstances, adequate information is available to the offerees." FDIC Motion at 34.

The FDIC then examines several factors to demonstrate that the exemption should apply. First, it claims that NBW had a very limited distribution for WBC commercial paper. However, NBW left behind copies of the Treasury Services brochure, discussed earlier, after sales calls to potential customers; these brochures advertised WBC commercial paper. The universe of offerees is thus large and impossible to recreate. Moreover, the WBC commercial paper had been offered to the public for approximately six years. Finally, the diversity among the group of commercial paper holders indicates that the group of offerees was equally diverse and varied. *See* FDIC Appendix, Ex. 35.

Second, the FDIC claims that the investors had access to sufficient information to inform them of the risks inherent in the investment. Yet, none of the reports cited by NBW provided the information that would have been on a registration statement.[19] *See* FDIC Appendix, Exs. 19–27; AFSCME Reply at 36.

Finally, the FDIC claims that AFSCME was financially sophisticated and thus could fend for itself without a registration statement. Yet, FDIC provides no indication that all the offerees were sophisticated; nor could they given the indeterminate class of offerees.[20] Moreover, NBW even had to tell AFSCME's employee what commercial paper was when AFSCME first started investing; this hardly shows the high level of sophistication necessary for the exemption to apply.

The FDIC has not demonstrated that there is any question regarding the application of § 4(2): despite the FDIC's arguments, the court concludes that relevant information—the type of information that would have been included on a registration statement and would have assisted inves-

---

17. It should be noted that counsel for Washington Bancorporation reached this same conclusion, albeit by a different method, at the time of the transactions. On March 22, 1990, Dow, Lohnes & Albertson sent an opinion letter to the Federal Reserve Bank of Richmond on behalf of WBC concerning WBC commercial paper's exemption from registration. In that letter, WBC's counsel acknowledged that, even in light of *Reves,* duration was not the sole criterion for determining whether or not the § 3(a)(3) exemption applied: "[c]learly, the mere fact that a note will mature within nine months *is not sufficient by itself to satisfy the requirements of the exemption.*" FDIC Appendix, ex. 6 at 5 (emphasis added). The letter further stated that "the federal courts generally concur that the paper must be of prime quality...." *Id.* at 6. Finally, WBC's counsel stated that important to the determination of whether the exemption applies are "... the paper's speculative nature [and] the solvency of the issuer...." *Id.*

18. 15 U.S.C. § 77d provides that "The provisions of section 77e of this title shall not apply to— ... (2) transactions by an issuer not involving any public offering."

19. The information does not give an investor sufficient information to comprehend the risky nature of WBC commercial paper, but rather reports on personnel changes and the like. In fact, some of these reports were released only after NBW's collapse; these, of course, were of no guidance to the already hapless investors.

20. As the FDIC admits, § 4(2) applies to a particular offering, not any particular offeree. *See* FDIC Motion at 41. Thus, all the offerees must be sophisticated or the exemption does not apply. The FDIC has not made any such demonstration nor indicated that it could do so.

tors—was not sufficiently available to the offerees. Thus, § 4(2) does not apply.

### 3. Conclusion.

The FDIC has not demonstrated that there is a genuine issue of material fact as to either of these exemptions. Thus, the court concludes that the WBC commercial paper did have to be registered under § 5.

### D. *Loss Causation.*

■ The individual defendants claim that summary judgment is precluded by the plaintiff's failure to prove loss causation, that is, that NBW's failure to register actually caused AFSCME's losses. However, loss causation is not an element of the prima facie case under § 12(1); thus, absence of proof on this element is irrelevant.

To prove their point, the individual defendants rely on several cases dealing with § 12(2) of the 1933 Act. Although terms in the two provisions are often accorded similar interpretations by the courts, *see e.g., Pinter,* 486 U.S. at 642, 108 S.Ct. at 2076, the two causes of action are not identical. In fact, contrary to § 12(2), § 12(1) imposes strict liability:

> The registration requirements are the heart of the Act, and § 12(1) imposes strict liability for violating those requirements. Liability under § 12(1) is a particularly important enforcement tool, because in many instances a private suit is the only effective means of detecting and deterring a seller's wrongful failure to register securities before offering them for sale.

*Pinter,* 486 U.S. at 638. Even the FDIC, in their response to the SEC brief, acknowledges that § 12(1) gives the investor the "unconditional right to rescind, regardless of the cause of loss, adequacy of disclosure, or knowledge of the buyer." FDIC SEC Response at 5. *See also* FDIC Motion at 43 ("Section 12(1) imposes liability without fault on the part of the seller.").

In light of the strict liability nature of the cause of action, therefore, loss causa-

tion is. not a necessary element of AFSCME's prima facie case.

### III. DEFENSES.

The FDIC raises several defenses which, it claims, should prevent this court from granting summary judgment in favor of AFSCME. The court finds none of these defenses availing.

### A. *Statutory Defenses.*

The FDIC's statutory argument has two prongs: first, that a bank, like NBW, may not solicit sales of securities from its customers under the Glass–Steagall Act, 12 U.S.C. 24 (Seventh);[21] and second, that NBW's alleged solicitation of securities precludes recovery under § 12(1). Under the second prong, the FDIC claims that AFSCME's cause of action is precluded for three reasons: first, that recovery is precluded by the *D'Oench* doctrine; second, that the FDIC cannot be held liable for NBW's *ultra vires* acts; and third, that AFSCME may not recover due to statutory and legal non-recourse provisions. None of these survives scrutiny.

### 1. The *D'Oench* doctrine.

The FDIC asserts that the *D'Oench* doctrine prevents recovery by AFSCME in this case because NBW sent confirmation slips to AFSCME which stated that all sales were non-recourse. Because no other provisions are in the record of the bank, the FDIC asserts that AFSCME is bound by these statements.

■ This court has already dealt extensively with the effect of the *D'Oench* doctrine on this case. *See* Mem. Op., Mar. 10, 1992. *D'Oench* protects the FDIC from secret side agreements or any arrangement in which plaintiff takes part that would tend to deceive bank examiners; it applies when the gravamen of the FDIC's assertion is the failure to get an agreement in writing. *See FDIC v. State Bank of Virden,* 893 F.2d 139, 144 (7th Cir.1990). However, as the court determined in its previous opinion, Mem. Op. at 42–46, when

---

**21.** The court holds in III.A.2., below, that a § 12(1) cause of action may go forward even if the Glass–Steagall Act has been violated. There-

fore, the court need not—and does not—determine whether NBW's actions constituted a violation of § 16.

the act being sued upon has no connection to an agreement, but rather involves an independent basis for liability, *D'Oench* is not implicated. *See Patterson v. FDIC,* 918 F.2d 540, 543 (5th Cir.1990) (holding that Homestead right under Texas state constitution exists independent of any agreement by parties); *In re Howard,* 65 B.R. 498 (Bankr.W.D.Tex.1986) (same); *but see Union Fed. Bank v. Minyard,* 919 F.2d 335, 336 (5th Cir.1990) (holding that appeal to usury laws did not bar bank's *D'Oench* defense).

■ Here AFSCME's § 12(1) claim is not based on an "agreement" of any kind; rather, NBW's liability results from the sale of unregistered securities. The illegality of the commercial paper is the fact that creates the liability, not any act or agreement between the parties. No facts or law have changed since the court issued its opinion in March,[22] and the court is not persuaded that there is any reason for the court to modify its previous holding today.

### 2. *Ultra vires* actions.

Section 16 of Glass–Steagall provides, in relevant part:

> The business of dealing in securities and stock by [a national banking] association shall be limited to purchasing and selling such securities and stock without recourse, solely upon the order, and for the account of, customers, and in no case for its own account, and the association shall not underwrite any issue of securities or stock....

12 U.S.C. § 24 (Seventh). The FDIC claims that this provision trumps AFSCME's § 12(1) cause of action. AFSCME, for its part, asserts that § 16 might preclude recovery on *ultra vires* contracts, but claims that § 16 does not bar recovery under statutory causes of action. However, neither party is able to cite the court to any cases which deal with the interrelation of § 16 and § 12(1),[23] and the court has also found none.

■ In examining the cases addressing these two statutory provisions and the policy interests behind them, the court determines that § 16 is not designed to prevent a wronged purchaser of securities from utilizing § 12(1). As mentioned above, § 12(1) is a powerful, strict liability cause of action designed to ensure that a purchaser may rescind a purchase or recover losses *whatever the cause. See Pinter,* 486 U.S. at 638, 108 S.Ct. at 2074. *See also* FDIC SEC Response at 5 (§ 12(1) provides "unconditional right to rescind, regardless of the cause of loss, adequacy of disclosure, or knowledge of the buyer."). There is nothing in the statutory language, the legislative history, or the later interpretation of § 16 which limits this view. Thus, the court holds that AFSCME's § 12 right of recovery is not precluded by NBW's alleged violation of § 16.

### 3. Non-recourse provisions.

■ Lastly, the FDIC argues that AFSCME may not recover because the sales agreement between NBW and AFSCME and § 16 of the Glass–Steagall Act provide that all sales of securities are non-recourse. However, the definition of "non-recourse" urged by the FDIC, encompassing as it does any possible liability— whether derived from contract, tort, or statute—of a bank to a purchaser of security, is significantly too broad. As the Court of Appeals for the Second Circuit has stated, § 16 prevents a bank form entering into *contracts* which obligate the bank to assume its brokerage customers' risks. *Securities Industry Ass'n v. Board of Governors,* 716 F.2d 92, 100 n. 4 (2d Cir.1983), *aff'd,* 468 U.S. 207, 104 S.Ct. 3003, 82 L.Ed.2d 158 (1984). Authority in this circuit agrees. *See Securities Industry*

---

**22.** The FDIC states that this court's March holding was based largely on the presumption in that opinion that NBW was a statutory seller of securities, a presumption not applicable on summary judgment. However, as the court today concludes that NBW was indeed a seller, this argument is moot.

**23.** Both parties do address *Deitrick v. Greaney,* 309 U.S. 190, 60 S.Ct. 480, 84 L.Ed. 694 (1940); *Awotin v. Atlas Exch. Nat'l Bank,* 295 U.S. 209, 55 S.Ct. 674, 79 L.Ed. 1393 (1935); *Texas & Pac. Ry. v. Pottorff,* 291 U.S. 245, 54 S.Ct. 416, 78 L.Ed. 777 (1934).

*Ass'n v. Board of Governors,* 627 F.Supp. 695, 701 (D.D.C.), *order rev'd on other grounds,* 807 F.2d 1052 (D.C.Cir.1986). No such contract was made in this case. Rather, NBW's liability is predicated on a federal statute and is therefore not precluded by § 16's non-recourse provision.

### 4. Conclusion.

Thus, none of the defenses raised by the FDIC either under the Glass–Steagall Act or the *D'Oench* doctrine protect the FDIC from § 12(1) liability.

### B. *Equity.*

The final issue the court must address is whether equity should prevent AFSCME's recovery. The FDIC makes two arguments: first, that AFSCME was a sophisticated investor which should not reap a windfall for a risky investment; and second, that federal law precludes punitive damages against the FDIC in its receiver capacity. Neither argument is successful.

### 1. Case law.

In its first argument, the FDIC asserts that cases such as *Pinter* and *D'Oench* indicate that any modicum of fault on the part of the securities purchaser should preclude recovery under § 12(1). By not allowing AFSCME to recover, the FDIC argues, the court would be preventing a sophisticated investor from reaping a windfall at the hands of innocent investors and the federal insurance fund.

■■■■ However, contrary to the FDIC's suggestions, *Pinter* advises that equitable limitation on § 12(1) recovery should occur in very limited contexts: only those in which the seller can demonstrate both significant fault on the part of the purchaser and that denial of recovery would *not* impede the purposes of the Securities Act. 486 U.S. at 633, 108 S.Ct. at 2071. In this case, however, NBW sold WBC commercial paper in a situation where a clear conflict of interest exists, particularly since both NBW and WBC were in dire economic straits (a fact of which NBW and WBC directors were well aware). AFSCME's alleged sophistication does not rise to such a level as to outweigh NBW's fault. Moreover, the purpose of the securities laws will be achieved only if § 12(1) liability is found whenever an entity sells unregistered, non-prime quality commercial paper to the public. Regardless of who the seller is, bank or individual, Congress' goals are achieved only if the law is enforced (even if, in this case, the FDIC must foot the bill).

### 2. Statutory law.

■■■■ The FDIC's final argument is that federal statutory laws prevent the imposition of punitive damages against the FDIC in its receiver status. Although the FDIC contends that a § 12(1) remedy is purely punitive and serves no deterrent effect, it is clear that § 12(1) provides only for actual damages suffered by the security purchaser. This argument must therefore fail.

## IV. CONCLUSION.

For the reasons set forth herein, AFSCME's motion for summary judgment on Count I will be GRANTED. AFSCME shall be entitled to entry of summary judgment against defendant for $1,800,000 plus interest and the costs of this action. The FDIC's counter-motion for summary judgment will be DENIED.